1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

18

NATIONAL PRODUCTS INC.,

Plaintiff,

v.

INNOVATIVE INTELLIGENT
PRODUCTS, LLC d/b/a GPS LOCKBOX,

Defendant,

v.

JEFFREY CARNEVALI,

Third-Party Defendant.

C20-428 RAJ

ORDER

19

20

21

22

23

THIS MATTER comes before the Court on a motion, docket no. 47, brought by plaintiff National Products Inc. ("NPI") to dismiss certain counterclaims and to strike certain affirmative defenses.  Having reviewed all papers filed in support of, and in

1   opposition to, the motion, and having concluded that the motion can be decided without

2   oral argument, the Court enters the following Order.

3   **Background**

4         In this action, NPI has asserted patent infringement claims against defendant

5   Innovative Intelligent Products, LLC d/b/a GPS Lockbox ("GPS") relating to four (4)

6   patents:  U.S. Patents Nos. 9,706,026 (the "'026 Patent"), 10,454,515 (the "'515 Patent"),

7   10,630,334 (the "'334 Patent"), and 10,666,309 (the "'309 Patent").  See 2d Am. Compl.

8   (docket no. 43).  Each of the patents-in-suit is titled "Docking Sleeve with Electrical

9   Adapter," and each discloses a "protective arrangement for an electronic device" and a

10  "fixedly positioned" adapter having a "male plug" that can mate with the "female socket

11  of the device."  See Exs. A–C to Am. Compl. (docket nos. 14-1, 14-2, & 14-3) ('026,



17  '515, and '334 Patents); Ex. A to McMichael Decl. (docket no. 48-1) ('309 Patent).  Each

18  patent contains the following illustration of an embodiment of the invention:

19  Fig. 2 of '026, '515, '334, & '309 Patents (docket nos. 14-1, 14-2, 14-3, & 48-1).

20        The above figure shows an electronic device with a touch-sensitive screen display

21  **25**, inserted into the cavity of a protective cover **100**, a docking cradle **5** that has a tray **7**

22  with a base receiver **9**, a docking connector **3**, which includes a plurality of biasing

23

electrical contacts (typically biasing pogo pins or biasing leaf spring contacts) that are coupled to leads in a cable **15**, and a clamp **19**, which has a compression component or arm **21**.  See '026, '515, '334, and '309 Patents at Cols. 6–10.  All of the patents-in-suit identify Jeffrey D. Carnevali as the inventor, and indicate that NPI is the assignee and applicant.  Id. at 1.

In response to NPI's Second Amended Complaint, GPS filed a Third Amended Answer and Amended Counterclaims ("3d Am. Ans."), docket no. 38.[1]  In its operative pleading, GPS has asserted twelve (12) affirmative defenses, four (4) of which NPI moves to strike, and seventeen (17) counterclaims, the last nine (9) of which NPI moves to dismiss.  GPS alleges, in essence, that Joseph Todrzak of GPS is the inventor (or at least a co-inventor) of the technology at issue, that the patents-in-suit were procured by fraud on the U.S. Patent and Trademark Office ("PTO"), and that NPI has misused the

---

[1] NPI accuses GPS of violating Federal Rule of Civil Procedure 15, which permits a party to amend its pleading "once as a matter of course" within 21 days after (i) serving it, (ii) service of a responsive pleading, or (iii) service of a motion under Rule 12(b), (e), or (f), whichever is earlier.  See Fed. R. Civ. P. 15(a)(1).  NPI contends that GPS used its "once as a matter of course" opportunity when it filed its Second Amended Answer and Amended Counterclaims, docket no. 35, on December 8, 2020.  Citing Ramirez v. County of San Bernardino, 806 F.3d 1002 (9th Cir. 2015), GPS counters that all prior amendments of its responsive pleading were filed with NPI's consent, as "other amendments" pursuant to Rule 15(a)(2), and that it invoked its "once as a matter of course" right only in filing its Third Amended Answer and Amended Counterclaims, docket no. 38.  NPI does not dispute that GPS's latest pleading was filed within 21 days after NPI filed its original motion to dismiss, docket no. 36, which was later voluntarily withdrawn, see Notice (docket no. 44), and NPI has not disagreed with GPS's characterization of its earlier amendments as having been filed only upon agreement of the parties, see Reply (docket no. 69); see also Stip. Mot. (docket no. 32).  The Court finds no procedural deficiency in GPS's operative pleading, but to the extent that GPS had already exercised its "once as a matter of course" option, the Court hereby GRANTS leave to amend nunc pro tunc and considers GPS's Third Amended Answer and Amended Counterclaims properly filed.

patents to engage in anticompetitive behavior.  <u>See</u> 3d Am. Ans. at ¶¶ 97–407 (docket no. 38).  According to GPS, while attending a trade show in Las Vegas in January 2014, Todrzak met representatives of a South Korean company known as Dae Han and learned of a magnetic connection system marketed under the brand name "Magtron."  <u>Id.</u> at ¶ 103.  By early February 2014, the Magtron system had been incorporated into GPS's electronic-device cradle called the Ultra Pro 7.  <u>Id.</u> at ¶¶ 111–13.  GPS avers that, since early 2014, the magnetic connection system and other material features of the Ultra Pro 7 have remained substantially the same, and that they are incorporated into the Accused Products, namely ATMOS cradle kits, ELD vehicle mount kits, Flex II cradle kits, Flex III ATMOS cradle kits, Eclipse PTT and ATMOS cradle packages, Push-to-Talk cradle packages, and various GPS Lockbox Rugged Cases, all of which are designed for Samsung devices.  <u>See id.</u> at ¶ 116; <u>see also</u> 2d Am. Compl. at ¶¶ 29, 36, 45, & 52 (docket no. 43) (describing the Accused Products).  In its operative pleading, GPS has offered the following view of the magnetic connection system at issue:



3d Am. Ans. at ¶ 114 (docket no. 38).

GPS indicates that Todrzak and a colleague, Jack Dovey, "presented, offered for sale, and otherwise made public" the Ultra Pro 7 (and two other products containing the magnetic connection system) at the Sprint Trade Show in Seattle, which was held in February 2014. Id. at ¶ 118. GPS further alleges that, in March or April 2014, Todrzak and Dovey met with Jake Parker and Aaron Hursey (misspelled in GPS's pleading and hereinafter appearing as "Hersey") of NPI at NPI's offices in Seattle and showed them the Ultra Pro 7, to explore the possibility of collaborating on its production. Id. at ¶¶ 129–38. According to GPS, in August 2014, NPI filed a patent application that was the first one to include any reference to a magnetic connection system. See id. at ¶¶ 145–53. Several more patent applications followed, and during the entire period of patent

prosecution, GPS and NPI were competitors in a "relatively small market of customers," but NPI never disclosed GPS's products to the PTO.  Id. at ¶¶ 201–02.

The first eight (8) of GPS's counterclaims seek declaratory relief of invalidity and non-infringement as to the four (4) patents-in-suit, and they are not the subject of NPI's motion to dismiss.  GPS's remaining counterclaims, which NPI seeks to dismiss, are as follows:  Counts Nine, Ten, and Eleven allege inequitable conduct before the PTO, Count Twelve seeks a declaratory judgment that Todrzak is a co-inventor of one or more of the patents-in-suit, Count Thirteen accuses NPI of patent mismarking, Count Fourteen pleads a violation of the unfair competition provisions of Washington's Consumer Protection Act ("CPA"), Counts Fifteen and Seventeen claim that NPI has engaged in anticompetitive conduct in violation of Washington and federal law, respectively, and Count Sixteen asserts that NPI tortiously interfered with GPS's economic relations.  Id. at ¶¶ 219–407.  GPS's eighth affirmative defense, which NPI moves to strike, overlaps with its Ninth, Tenth, and Eleventh Counterclaims alleging inequitable conduct.  See id. at ¶ 70.  NPI also asks that the Court strike GPS's ninth, tenth, and twelfth affirmative defenses of patent misuse, license, and unclean hands, respectively.  See id. at ¶¶ 71, 72–77, & 80.  Finally, counsel for NPI, which has not appeared on behalf of Carnevali, argues that GPS did not timely join Carnevali as a defendant and has not adequately pleaded claims for individual liability against him.

**Discussion**

**A.        Counterclaims**

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss

a counterclaim is evaluated under the same standards applicable to a motion to dismiss a

complaint.  See Lemman v. Foley, No. C20-591, 2020 WL 7181055, at *1 (W.D. Wash.

Dec. 7, 2020).  In a patent case, Rule 12(b)(6) motions are governed by regional circuit

law.  Deep9 Corp. v. Barnes & Noble, Inc., No. C11-35, 2012 WL 13019208, at *2

(W.D. Wash. July 11, 2012) (citing McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1355–

56 (Fed. Cir. 2007), and Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc., 347

F.3d 935, 937 (Fed. Cir. 2003)).  The Ninth Circuit instructs that, when considering a

Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true and

draw all reasonable inferences in favor of the non-moving party.  See id. (citing Wyler

Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998)).

Although a pleading challenged by a Rule 12(b)(6) motion to dismiss need not

provide detailed factual allegations, it must offer "more than labels and conclusions" and

contain more than a "formulaic recitation of the elements of a cause of action."  Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A pleading may be lacking for one of two

reasons:  (i) absence of a cognizable legal theory, or (ii) insufficient facts to support a

cognizable legal claim.  Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th

Cir. 1984).  The question for the Court is whether the facts in the pleading sufficiently

state a "plausible" ground for relief.  Twombly, 550 U.S. at 570.  If the Court dismisses a

pleading or portions thereof, it must consider whether to grant leave to amend.  Lopez v.

1  Smith, 203 F.3d 1122, 1130 (9th Cir. 2000); see Fed. R. Civ. P. 15(a)(2) (leave to amend

2  should be "freely" given "when justice so requires").

3    **1. Inequitable Conduct**

4    Although the Ninth Circuit's procedural standards apply to NPI's Rule 12(b)(6)

5  motion, whether inequitable conduct has been adequately pleaded is a question of Federal

6  Circuit, not regional circuit, jurisprudence because it "pertains to or is unique to patent

7  law." Deep9, 2012 WL 13019208, at *2 (citing Exergen Corp. v. Wal-Mart Stores, Inc.,

8  575 F.3d 1312, 1326 (Fed. Cir. 2009)).  "The substantive elements of inequitable conduct

9  are:  (1) an individual associated with the filing and prosecution of a patent application

10  made an affirmative misrepresentation of a material fact, failed to disclose material

11  information, or submitted false material information; and (2) the individual did so with a

12  specific intent to deceive the PTO." Id.  Although scienter may be alleged generally, a

13  pleading of inequitable conduct must, in addition to stating the who, what, when, where,

14  and how of the material misrepresentation or omission, "include sufficient facts from

15  which a court can 'reasonably infer that a specific individual both knew of the

16  invalidating information that was withheld from the PTO and withheld that information

17  with a specific intent to deceive the PTO.'" Id. (quoting Delano Farms Co. v. Cal. Table

18  Grape Comm'n, 655 F.3d 1337, 1350 (Fed. Cir. 2011)); see also Fed. R. Civ. P. 9(b).

19    GPS's three theories of inequitable conduct are as follows:  with the intent to

20  deceive the PTO, Carnevali, a co-owner of NPI, and/or others acting on his behalf

21  (i) misrepresented to the PTO that he was the sole inventor as to the patents-in-suit;

22  (ii) misrepresented (or made inconsistent representations) to the PTO concerning the state

23

of the art related to biasing contacts (biasing pogo pins or biasing leaf spring contacts); and/or (iii) withheld from the PTO information about the Ultra Pro 7 and other GPS products.  See 3d Am. Ans. at ¶¶ 219–340 (docket no. 38).

With regard to the first claim of inequitable conduct (the Ninth Counterclaim), NPI argues that GPS has not pleaded enough to establish joint inventorship and that GPS has not provided corroboration for its assertion that Todrzak and Dovey met with Parker and Hersey in March or April 2014.  GPS, however, need not prove joint inventorship to establish inequitable conduct; the crux of its claim is that NPI copied GPS's design and that Carnevali, with knowledge of this fact, misrepresented to the PTO that he invented the magnetic connection system disclosed in the various patents-in-suit.  GPS also need not, at this stage of the proceedings, proffer evidence to support its factual statements; rather, the Court must accept the allegations of GPS's operative pleading as true and draw all reasonable inferences in favor of GPS.  Having done so, the Court concludes that GPS's Ninth Counterclaim for inequitable conduct is sufficiently pleaded.  Whether this particular accusation of inequitable conduct has merit is a question for another day.

As to GPS's second claim of inequitable conduct (the Tenth Counterclaim), NPI does not rely on an absence of a cognizable legal theory or supporting facts, but rather disputes the inferences to be drawn from the allegations of the operative pleading.  GPS asserts that NPI indicated in five patent applications filed between February 24, 2014, and March 24, 2015, that "[m]ost docking cradles . . . use some sort of biasing pogo pin or biasing leaf spring contact in the docking connector."  3d Am. Ans. at ¶¶ 275–78.  The applications that ripened into the patents-in-suit, however, did not contain this statement

1   about biasing contacts, id. at ¶¶ 279–80, and in response to the patent examiner's initial

2   rejections based on prior art, Carnevali (or others on his behalf) amended the claim

3   language to specify biasing contacts, id. at ¶¶ 283–291.  GPS alleges that, but for this

4   change, the claims of the patents-in-suit would not have been allowed, see id. at ¶ 301

5   (quoting Notice of Allowance for '026 Patent (Application No. 14/936,517)), and that

6   omission of the earlier explanation about the state of the art relating to biasing contacts

7   violated the duty of candor owed to the PTO.

8        In seeking to dismiss the Tenth Counterclaim, NPI denies that it "removed" the

9   statement about biasing contacts, but this argument involves mere semantics; GPS's

10  pleading is best understood as alleging that the statement was "omitted," as opposed to

11  "removed," from the relevant patent applications.  NPI also explains that the patent

12  examiner, not NPI, indicated that the prior art did not disclose biasing contacts, but this

13  account of events misses the point of GPS's accusation.  GPS contends that, because

14  Carnevali (or others acting on his behalf) omitted the statement about biasing contacts,

15  the patent examiner was misled into believing that biasing contacts were novel over the

16  prior art.  Again, whether GPS's accusation of inequitable conduct has merit is an issue

17  for another time; for now, the Court concludes that GPS has provided the requisite who,

18  what, when, where, and how in support of its Tenth Counterclaim.

19       With respect to the last claim of inequitable conduct (the Eleventh Counterclaim),

20  NPI again tries to deny the factual allegations of GPS's Third Amended Answer and

21  Amended Counterclaims.  NPI, however, cannot prevail on a motion to dismiss by

22  insisting on evidence to corroborate the operative pleading.  NPI also discounts the

23

1   reasonable inferences to be drawn from the factual information proffered by GPS,

2   arguing that, even if Todrzak and Dovey did meet with Parker and Hersey, GPS has not

3   plausibly suggested that Carnevali was told (by Parker or Hersey) about the Ultra Pro 7

4   or knew he should have disclosed it to the PTO.  GPS has, however, further indicated that

5   Carnevali is one of NPI's owners, that the first patent application listing Carnevali as the

6   inventor in which a magnetic connection system was disclosed was filed a few months

7   after Todrzak and Dovey supposedly showed the Ultra Pro 7 to Parker and Hersey, that

8   NPI and GPS were (and still are) competitors in a small market, and that the Ultra Pro 7

9   and GPS's other products were publicly available during the period when the patents-in-

10   suit were being prosecuted.  Taken together, these factual assertions, along with the

11   alleged meeting in the spring of 2014, give rise to a reasonable inference and plausible

12   claim that Carnevali was aware of GPS's magnetic connection system and intentionally

13   withheld it from the PTO.  GPS will be permitted to further develop its Eleventh

14   Counterclaim for inequitable conduct.

15         **2.**    **<u>Co-Inventorship</u>**

16        GPS's Twelfth Counterclaim, seeking a declaration that Todrzak is a co-inventor

17   of one or more of the patents-in-suit, is pleaded under 35 U.S.C. § 256.  <u>See</u> 3d Am. Ans.

18   at ¶ 343 (docket no. 38).  Section 256, however, is "limited in effect and cannot properly

19   be the vehicle for substituting [or adding] inventors on a patent . . . [based on] a claim

20   sounding in . . . fraud."  <u>Bemis v. Chevron Rsch. Co.</u>, 599 F.2d 910, 912 (9th Cir. 1979).

21   Section 256 provides a remedy for "only innocent errors in joinder or non-joinder of

22   inventors."  <u>Id.</u>  GPS does not assert inadvertence or mere oversight in omitting Todrzak

23

as a co-inventor, but rather contends his exclusion was fraudulent, and thus, GPS has not

stated a cognizable claim under § 256.  No purpose would be served in allowing GPS to

amend its Twelfth Counterclaim; if Carnevali is not the sole inventor (an assertion that

must be proven by clear and convincing evidence), then the patents-in-suit are invalid and

Todrzak could not be simply joined as a co-inventor.  See Solomon v. Kimberly-Clark

Corp., 216 F.3d 1372, 1381 (Fed. Cir. 2000).  In light of these rulings, the Court need not

address NPI's arguments concerning the substantive deficiencies of GPS's assertion that

Todrzak is a co-inventor of one or more of the patents-in-suit.

### 3.   Patent Mismarking

GPS's Thirteenth Counterclaim is brought under 35 U.S.C. § 292, which prohibits

inter alia affixing on an unpatented article the word "patent" (or a word or number

implying that the item is patented) for the purpose of deceiving the public.  GPS contends

that NPI has engaged in this type of patent mismarking by listing its patents on a website

in a vague, confusing, or inaccurate manner, rather than specifying the relevant patents on

its products or accompanying literature.  See 3d Am. Ans. at ¶¶ 351–60 (docket no. 38).

Because § 292 claims sound in fraud, the heightened pleading standards of Rule 9(b)

apply.  See Music Grp. Servs. US Inc. v. Peavey Elecs. Corp., No. C10-2066, 2011 WL

13232515, at *2 (W.D. Wash. June 21, 2011).  To survive a Rule 12(b)(6) challenge, an

accusation of mismarking must contain particularized allegations plausibly showing (i) an

unpatented article was (ii) marked in a way that falsely suggested it is patented (iii) with

the intent of deceiving the public.  See id. (citing Brinkmeier v. Graco Child.'s Prods.

Inc., 684 F. Supp. 2d 548, 551 (D. Del. 2010)).

1    An item is "unpatented" within the meaning of § 292 if it is "not covered by at

2    least one claim of each patent with which the article is marked." Clontech Labs., Inc. v.

3    Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005).  If a product is mismarked as

4    "patented," then the inquiry is whether the accused party had a reasonable belief that the

5    article was covered by the patent or patents at issue.  Id. at 1352–53.  An honest, but

6    mistaken, view that a mismarked item was indeed patented cannot be a basis for liability,

7    but the mere assertion of a lack of intent to deceive is also not a sufficient defense.  Id.

8    at 1352.  The question of intent is measured by objective criteria and "the *fact* of

9    misrepresentation coupled with proof that the party making it had knowledge of its falsity

10   is enough to warrant drawing the inference that there was a fraudulent intent."  Id.

11   (emphasis in original).  To survive a motion to dismiss, a mismarking claim must contain

12   "specific underlying facts" tending to show the requisite knowledge from which intent

13   may be inferred.  See In re BP Lubricants USA Inc., 637 F.3d 1307, 1311–12 (Fed.

14   Cir. 2011).

15   In its operative pleading, GPS indicates that (i) NPI sell numerous products under

16   the trademarks "GDS" and "IntelliSkin," (ii) some of these items are not covered by any

17   of the patents-in-suit, (iii) NPI's website associates all of the patents-in-suit with the

18   "GDS" and "IntelliSkin" branded articles, see Ex. E to Tamimi Decl. (docket no. 37-5)

19   (printed from NPI's webpage https://www.rammount.com/legal), and (iv) NPI has

20   admitted in discovery that it sells no embodiment of the claims of one of the four patents-

21   in-suit, namely the '334 Patent.  3d Am. Ans. at ¶¶ 358–59 (docket no. 38).  NPI counters

22   that its website contains the explanation that its RAM® products are "covered under one

23

1    or more of the following patents," which "undercuts" GPS's premise that NPI intended to

2    deceive the public; NPI contends that its overbroad listing of patents serves the public

3    interest by providing notice of all "patents that would need to be avoided to launch a

4    competing product."  Mot. at 18–19 (docket no. 47).  NPI further argues that GPS's

5    failure to allege that any of NPI's products are not covered by at least one patent is fatal

6    to its mismarking claim.

7        NPI cites no legal authority to support its propositions concerning what GPS must

8    plead or eventually prove, and Clontech, which NPI did not cite, actually contradicts

9    NPI's contentions.  Clontech suggests that NPI's attempted disclaimer ("one or more of

10   the following") is ineffective and that at least one claim of each listed patent must "read

11   on" the marked article.  The Federal Circuit opinion also undermines NPI's apparent

12   assertion that, if at least one listed patent covers the marked product, then the product is

13   not "unpatented" within the meaning of § 292.  NPI's mistake in enumerating more

14   patents than it honestly believed protected its "GDS" and "IntelliSkin" articles appears to

15   be one of law, not of fact, and the Court concludes that GPS has adequately pleaded the

16   requisite knowledge from which an intent to deceive may be inferred.  Thus, GPS's

17   Thirteenth Counterclaim remains in the case.

18       **4.    CPA Violation**

19       Other than noting that an individual may be held personally liable for a CPA

20   violation, see Resp. at 23 (docket no. 67), GPS has made no effort to support its

21   Fourteenth Counterclaim.  A CPA claim is preempted when it merely restates claims

22   that are or could be brought under federal patent law.  See Milo & Gabby, LLC v.

23

1    Amazon.com, Inc., 12 F. Supp. 3d 1341, 1347 (W.D. Wash. 2014).  GPS's operative

2    pleading does not set forth subject matter for the CPA claim that is outside the realm of

3    patent law, and GPS has not stated a cognizable claim for unfair competition under

4    RCW 19.86.020.  The Court recognizes that NPI did not invoke preemption as a basis for

5    dismissal, and the Court will therefore grant leave to amend, but reminds GPS and its

6    attorneys of their obligations under Federal Rule of Civil Procedure 11 and 28 U.S.C.

7    § 1927.

8         **5.    Anticompetitive Behavior**

9         GPS's Fifteenth and Seventeenth Counterclaims are predicated on GPS's assertion

10   that the patents-in-suit were procured through fraud.  An entity that obtained a patent by

11   fraud may not enjoy the limited exception for patents to the monopoly prohibitions of

12   Section 2 of the Sherman Act.  See Walker Process Equip., Inc. v. Food Mach. & Chem.

13   Corp., 382 U.S. 172, 175–77 (1965); see also 15 U.S.C. § 2.  Because a Walker Process

14   monopolization claim arises under the Sherman Act (or state antitrust law), and not patent

15   law, it must be evaluated under regional circuit (or state) jurisprudence.  See Chandler v.

16   Phoenix Servs. LLC, 1 F.4th 1013 (Fed. Cir. 2021) (concluding that the Federal Circuit

17   lacks appellate jurisdiction as to a standalone Walker Process monopolization claim).

18   Use of a fraudulently-acquired patent constitutes an antitrust violation if the patent was

19   employed to produce (or attempt to produce) monopoly power in a specified market.  See

20   Bourns, Inc. v. Raychem Corp., 331 F.3d 704, 711 (9th Cir. 2003).  To establish liability

21   for monopolization, GPS must show that (i) NPI possessed monopoly power in the

22   relevant market; (ii) NPI willfully acquired or maintained such power; and (iii) GPS

23

1    suffered causal antitrust injury.  See Fed. Trade Comm'n v. Qualcomm Inc., 969 F.3d

2    974, 989–90 (9th Cir. 2020).  To prove attempted monopolization, GPS must demonstrate

3    that (i) NPI engaged in predatory or anticompetitive conduct with (ii) a specific intent to

4    monopolize and (iii) a dangerous probability of achieving monopoly power.  See

5    Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); see also Cascade Health

6    Sols. v. PeaceHealth, 515 F.3d 883, 893 (9th Cir. 2008).  But see Boeing Co. v. Sierracin

7    Corp., 108 Wn.2d 38, 59, 738 P.2d 665 (1987) (declining to adopt "dangerous probability

8    of success" as an element of a claim under RCW 19.86.040 because it may be inferred

9    from specific intent and monopoly power, citing Lessig v. Tidewater Oil Co., 327 F.2d

10   459, 474–75 (9th Cir. 1964), abrogated by Spectrum Sports, 506 U.S. at 457–59).

11          NPI contends that GPS's antitrust counterclaims should be dismissed because

12   GPS has not (i) adequately pleaded inequitable conduct, (ii) defined the relevant market,

13   or (iii) alleged an antitrust injury.  NPI's first argument fails for the reasons set forth in

14   Section A.1 of this discussion.  NPI's second ground for dismissal accuses GPS of

15   defining the market in a "hyper-narrow" manner, see Mot. at 16 (docket no. 47), but the

16   authority on which NPI relies does not support such conclusion.  See Adidas Am., Inc. v.

17   Nat'l Collegiate Athletic Ass'n, 64 F. Supp. 2d 1097 (D. Kan. 1999).  As explained in

18   Adidas, "a relevant market must be defined by 'the interchangeability of use or the cross-

19   elasticity of demand between the product [in question] and substitutes for it.'"  Id. at

20   1102 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  GPS's

21   operative pleading satisfies this standard; it indicates that four or five entities, including

22   NPI and GPS, are the primary suppliers of articles similar to the Accused Products, and it

23

1    names ProClip USA Inc. ("ProClip"), Brodit AB ("Brodit"), and Arkon Resources, Inc.

2    ("Arkon") as the other competitors.  3d Am. Ans. at ¶¶ 378–81 (docket no. 38).  NPI does

3    not contend that GPS has omitted one or more sources of interchangeable or substitute

4    goods or that GPS could not cure any deficiency by amending its definition of the

5    relevant market.  Thus, NPI has not demonstrated that failure to plead the relevant market

6    constitutes a basis to dismiss with prejudice GPS's counterclaims under Sherman Act § 2

7    and/or RCW 19.86.040.

8         NPI's last assertion, namely that GPS has not alleged an antitrust harm, likewise

9    lacks merit.  GPS's operative pleading indicates that NPI has sued ProClip and Brodit in

10   the District of Wisconsin for infringement of at least two of the patents-in-suit in this

11   matter, and that NPI has entered into a licensing agreement with Arkon after suing it for

12   patent infringement.  See 3d Am. Ans. at ¶¶ 379 & 381.  In essence, GPS contends that

13   NPI is using the patents-in-suit, which were allegedly obtained through fraud, to try to

14   force every competitor out of the market.  Of course, if the patents-in-suit are valid, NPI

15   may, without fear of antitrust liability, exercise its right to exclude others from practicing

16   the art described therein.  See In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322,

17   1325 (Fed. Cir. 2000) ("The commercial advantage gained by new technology and its

18   statutory protection by patent do not covert the possessor thereof into a prohibited

19   monopolist." (quoting Abbott Labs. v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1991))).

20   On the other hand, if the patents-in-suit are tainted by inequitable conduct before the

21   PTO, then NPI's systematic use of them in litigation against its competitors results in the

22   type of anticompetitive injury that the Sherman Act and RCW 19.86.040 are intended to

23

1   rectify.  See id. at 1326 (citing Walker Process, 382 U.S. at 177).  The Court concludes

2   that GPS's Fifteenth and Seventeenth Counterclaims are adequately pleaded.

### 6.   Tortious Interference

4       In response to NPI's motion to dismiss, GPS offers minimal analysis concerning

5   how the facts alleged in its operative pleading support its Sixteenth Counterclaim.  The

6   tort of interference with a business expectancy has five elements:  (i) the existence of a

7   business expectancy; (ii) knowledge of that expectancy; (iii) interference with the

8   expectancy done for an improper purpose or using improper means; (iv) termination of

9   the expectancy induced or caused by the interference; and (v) resultant damage.  See

10  Greensun Grp., LLC v. City of Bellevue, 7 Wn. App. 2d 754, 768, 436 P.3d 397 (2019)

11  (quoting Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 351, 144 P.3d

12  276 (2006)).  In connection with the Sixteenth Counterclaim, the business expectancy at

13  issue was the potential sale of GPS to a third party.  See 3d Am. Ans. at ¶ 393 (docket

14  no. 38).  The operative pleading, however, does not indicate that NPI knew about the

15  potential sale and does not explain how or why the potential sale was interrupted or

16  terminated.  Absent additional factual allegations, the Court cannot conclude that the

17  tortious interference counterclaim is plausible.  Although NPI has sought dismissal with

18  prejudice, it has not made a showing that amendment would be futile.  Thus, GPS will be

19  provided an opportunity to try to correct the deficiencies of its Sixteenth Counterclaim.

## B.   Affirmative Defenses

21      Like a Rule 12(b)(6) motion, a motion brought under Federal Rule of Civil

22  Procedure 12(f) to strike one or more affirmative defenses is governed by regional circuit

23

1    law.  See Ameranth, Inc. v. Pizza Hut, Inc., No. 11-CV-1810, 2012 WL 12918370, at *2

2    (S.D. Cal. June 26, 2012) (citing McZeal, 501 F.3d at 1355–56).  The Court may strike

3    from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or

4    scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike are generally disfavored and

5    should be granted only when doing so will "save time and expense" by disposing of

6    matters that "clearly could have no possible bearing on the subject of the litigation."

7    Ameranth, 2012 WL 12918370, at *3 (citing Neilson v. Union Bank of Cal., N.A., 290

8    F. Supp. 2d 1101, 1152 (C.D. Cal 2003), and quoting Platte Anchor Bolt, Inc. v. IHI, Inc.,

9    352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004)).

10          Whether Twombly's "plausibility" standard applies to affirmative defenses has not

11   been addressed by the Ninth Circuit, and district courts have ruled in a variety of ways.

12   Id. at *3 & n.1.  In Ameranth, in declining to require that affirmative defenses meet the

13   "plausibility" test, the court reasoned that Rule 8(a)(2)'s requirement that a pleader

14   "show" entitlement to relief, which is the language upon which Twombly's doctrines are

15   built, differs from Rule 8(c)'s directive that a responding party "state" its defenses.  Id.

16   The Ameranth Court further observed that practical and judicial economy considerations

17   (for example, the limited time allowed to prepare an answer, avoidance of repeated

18   amendments, and discouragement of motions to strike brought for dilatory or harassment

19   purposes) support the traditional standard for pleading affirmative defenses, namely

20   whether the statement provides "fair notice."  Id. at *4 (citing Wyshak v. City Nat'l

21   Bank, 607 F.2d 824, 827 (9th Cir. 1979)); see also Hargrove v. Hargrove, No. 16-1743,

22   2017 WL 1788426, at *1 (W.D. Wash. May 5, 2017) ("Courts generally decline to strike

23

1   affirmative defenses unless the moving party shows [that] 'there are no questions of fact,

2   that any questions of law are clear and not in dispute, and that under no set of

3   circumstances could the defense succeed.'").

4        1.   **Inequitable Conduct, Patent Misuse, and Unclean Hands**

5        For the same reasons NPI failed to demonstrate that GPS's inequitable conduct

6   counterclaims should be dismissed, NPI's motion to strike GPS's affirmative defenses of

7   inequitable conduct, patent misuse, and unclean hands lacks merit.  As drafted, these

8   affirmative defenses give "fair notice" of GPS's contention that it cannot be held liable

9   for infringement of the patents-in-suit because they are invalid and/or unenforceable,

10  NPI is misusing them, and/or NPI is equitably barred from recovering by its improper

11  behavior.

12       2.   **License**

13       In its tenth affirmative defense, GPS indicates that some of the Accused Products

14  are covered by the aforementioned license between NPI and Arkon.  3d Am. Ans. at

15  ¶¶ 73–76 (docket no. 38).  GPS has further explained that it purchases (or has purchased)

16  some of the Accused Products from Arkon.  Resp. at 17 (docket no. 67).  NPI, however,

17  has proffered evidence outside the pleadings[2] showing that the license with Arkon

18  concerns only U.S. Patent No. 6,585,212, which is not one of the patents-in-suit.  See

19  Settlement Agreement, Ex. E to McMichael Decl. (docket no. 48-5).  In response, GPS

20  _____

21  [2] The directive requiring the Court to convert a Rule 12(b)(6) or 12(c) motion into one for
    summary judgment if matters outside the pleadings are presented and not excluded does not
22  apply to Rule 12(f) motions to strike.  See Fed. R. Civ. P. 12(d).

23

ORDER - 20

1  has not identified any other license that might support its affirmative defense, and thus,

2  has not given the requisite "fair notice."  Moreover, NPI has met its burden to show that,

3  with respect to GPS's license defense, no questions of fact exist, the questions of law are

4  clear and not in dispute, and given the circumstances, the defense cannot succeed.  See

5  Hargrove, 2017 WL 1788426, at *1.  GPS's tenth affirmative defense is STRICKEN as

6  insufficient.  See Fed. R. Civ. P. 12(f).

7  **C.**    **Individual Liability**

8          The record contains no indication that GPS's third-party claims against Carnevali

9  have been properly served, and no attorney has appeared on Carnevali's behalf.  Unless

10  GPS takes the steps necessary to join Carnevali as a third-party defendant, the Court sees

11  no purpose in addressing the arguments made by NPI concerning the insufficiency of

12  GPS's third-party claims against Carnevali.  The Court notes, however, that Carnevali

13  need not be individually named as a party with respect to GPS's inequitable conduct

14  counterclaims; the patents-in-suit have been assigned to NPI, and NPI is the real-party-in-

15  interest in supporting their validity.  See Delano Farms, 655 F.3d at 1342 (observing that,

16  if a patentee has transferred all substantial rights in a patent to another, for example, an

17  exclusive licensee, then the assignor is no longer regarded as the owner of the patent and

18  need not be joined in any action brought on the patent).

19          **Conclusion**

20          For the foregoing reasons, the Court ORDERS:

21          (1)    NPI's motion, docket no. 47, is GRANTED in part, STRICKEN in part,

22  and DENIED in part, as follows:

23

ORDER - 21

1          (a)     GPS's Twelfth Counterclaim for a declaration of co-inventorship is

2   DISMISSED with prejudice;

3          (b)     GPS's Fourteenth Counterclaim for violation of the CPA is

4   DISMISSED without prejudice and with leave to amend;

5          (c)     GPS's Sixteenth Counterclaim for tortious interference with business

6   expectancy is DISMISSED without prejudice and with leave to amend;

7          (d)     GPS's tenth affirmative defense based on a license between NPI and

8   Arkon is STRICKEN with prejudice;

9          (e)     NPI's arguments advanced on behalf of Carnevali are STRICKEN as

10  premature and not yet ripe for the Court's consideration; and

11         (f)     NPI's motion is otherwise DENIED.

12  (2)     Any amended pleading by GPS must be electronically filed within fourteen

13  (14) days of the date of this Order.  Any responsive pleading or motion by NPI shall be

14  filed within fourteen (14) days thereafter.  See Fed. R. Civ. P. 15(a)(3).

15  (3)     The Clerk is directed to send a copy of this Order to all counsel of record.

16  IT IS SO ORDERED.

17  Dated this 25th day of October, 2021.

18

19

20  The Honorable Richard A. Jones
    United States District Judge

21

22

23