1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

NATIONAL PRODUCTS INC,

CASE NO. 2:20-cv-00428-DGE

12

Plaintiff,

v.

ORDER ON MOTION TO
EXCLUDE EXPERT TESTIMONY
OF DREW E. VOTH (DKT. NO.
214)

13

INNOVATIVE INTELLIGENT
PRODUCTS LLC d/b/a GPS LOCKBOX,

14
15

Defendant.

16

    This matter comes before the Court on the motion of Defendant GPS Lockbox ("GPS")

17

to exclude the opening and reply reports of Drew E. Voth, the damages expert for Plaintiff

18

National Products Inc. ("NPI").  (Dkt. No. 214.)  The Court has considered the pleadings filed in

19

support of and in opposition to the motion and the remainder of the record.  For the reasons set

20

forth below Defendant's motion is DENIED.

21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# I.   FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes familiarity with the factual and procedural background of this case. On December 22, 2023, Defendant filed under seal a motion to exclude Voth's expert reports.[1] (Dkt. No. 214.)  On December 26, 2023, Defendant filed an unsealed, redacted version of the motion.  (Dkt. No. 223.)  The Court will cite to the unsealed version of the motion throughout this order.

# II.   LEGAL STANDARD

## A.  Federal Rules of Evidence

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

## B.  *Daubert* Standard

"Before admitting expert testimony into evidence, the district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation

---

[1] On May 23, 2024, the Court granted two motions (Dkt. Nos. 213, 227) to seal witness reports, Voth's deposition, and documents related to Plaintiff's response to Defendant's motion.  (Dkt. No. 248.)

ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY OF DREW E. VOTH (DKT. NO. 214) - 2

marks omitted) (quoting *Daubert*, 509 U.S. at 597).  This requires the court to determine if the expert's reasoning or methodology underlying the testimony: (1) is scientifically valid (i.e. reliable); and (2) can be applied to the facts at issue (i.e. relevant).  *Daubert*, 509 U.S. at 592–593.

The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Ruvalcaba-Garcia*, 923 F.3d. at 1188–1189 (internal quotation marks omitted).  If an expert's opinion is found to be reliable, however, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 592, 596.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).  "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id*., citing *Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007).

The party seeking to introduce expert testimony evidence must show by a preponderance of the evidence that the testimony is admissible under Rule 702.  *Daubert*, 509 U.S. at 592, n.10.  However, Rule 702 should be applied with a "liberal thrust" favoring admission.  *Messick v. Novartis Pharms. Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014).

ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY OF DREW E. VOTH (DKT. NO. 214) - 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### III.     DISCUSSION

**A.  Drew E. Voth**

####     1.   Voth's Background and Experience

Voth is a Senior Director with Alvarez & Marsal Valuation Services, LLC ("A&M") in Seattle, which is a U.S. member firm of Alvarez & Marsal Holdings LLC, a global tax and business advisory organization that provides tax and advisory services to public and private clients.  (Dkt. No. 218 at 5.)  Voth provides clients with valuation, litigation expert witness services and investigative services.  (*Id.*)  Voth also provides damages calculations and other litigation support services.  (*Id.*)

Voth has over 30 years of experience and has testified in arbitration proceedings, at trial, and in depositions on a variety of damages matters.  (*Id.*)  Voth holds a degree in economics, has co-authored a book on calculating damages in intellectual property cases, and is a member of numerous professional associations.  (*Id.*)  Voth is a Certified Public Accountant certified in financial forensics, a Certified Valuation Analyst, a Certified Fraud Examiner, and a Certified Insolvency and Reorganization Advisor certified in distressed business valuation.  (*Id.*)

####     2.   Voth's Report

As relevant here, Voth opined, in an expert report dated September 15, 2023, that Plaintiff is entitled to between $22.7 million and $36 million in lost profits.  (Dkt. No. 218 at 32–33.)  Voth also offered an opinion concerning what a reasonable royalty would be in this case, applying a 20% royalty to Defendant's average prices for accused cradle, cover, and kit products, resulting in royalty rates of $7.04 per accused cover, $10.65 per accused cradle, and either $30.71 or $17.69 per accused kit.  (*Id.* at 57.)

Voth considered information from a variety of sources when preparing his report, including "various pleadings, documents, financial data, and marketing data." (*Id.* at 6.) Voth also interviewed Jeffrey Carnevali, President and Chief Executive Officer at NPI and inventor of the asserted patents; Chad Remmers, NPI's Chief Operating Officer; Michael Turner, NPI's Chief Financial Officer; Jake Parker, NPI's Director of Sales and Business Development; and James Babcock, the technical expert hired on behalf of NPI. (*Id.*)

**B. Analysis**

1. <u>Lost Profits</u>

Voth's lost profits analysis is based on the test set forth by the Sixth Circuit in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*. (Dkt. No. 218 at 15–33.) Under the *Panduit* test, to obtain as damages the profits on sales a patent owner would have made absent the infringement, i.e., the sales made by the infringer, the owner must prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." 575 F.2d 1152, 1156 (6th Cir. 1978).

*a. Acceptable Non-Infringing Substitutes*

Defendant argues Voth improperly assumed the absence of non-infringing substitutes despite evidence that such substitutes were available during the relevant period. (Dkt. No. 223 at 6–7.) Defendant contends Voth's unfounded assumption "infects" his analysis of the second *Panduit* factor and renders his opinion unreliable. (*Id.* at 7.)

For purposes of his analysis, Voth assumed Plaintiff's witnesses and technical expert would offer evidence sufficient to prove "that there are no acceptable non-infringing substitutes on the market sold by companies that have not been identified as infringers or likely infringers."

(Dkt. No. 218 at 18.)  Defendant contrasts this with the report provided by its own expert, Frank Bernatowicz, who, when considering the second *Panduit* factor, identified several acceptable non-infringing substitutes.[2]  (Dkt. No. 218-2 at 37–39.)  Plaintiff argues the assumption made by Voth goes to the weight of his opinion rather than its admissibility and that Voth's opinion is amply supported.  (Dkt. No. 229 at 7–8.)

In formulating his opinion regarding the existence of acceptable non-infringing substitutes, Voth relied on evidence offered by Plaintiff's witnesses.  (Dkt. No. 218 at 19.)  Voth also relied upon evidence submitted by Defendant's witnesses, citing deposition testimony from GPS founder Jack Dovey concerning alleged GPS prior art products that were either defunct or no longer sold.[3]  (*Id.*)  Voth also cited deposition testimony from GPS Vice President Thomas Nelson, stating Nelson testified that many of the alleged non-infringing alternatives "do not provide the claimed functionality afforded by the patents-in-suit."  (*Id.* at 21.)

Voth also noted that "most mobile electronic device holders are less expensive than the practicing and accused products, and do not appear to offer the benefits of the patented inventions, as they do not provide the combination of protection, charging and convenience" of NPI's products.  (*Id.* at 19.)  Voth cited two products as examples, a shockproof case for the Samsung Galaxy Tablet, which "does not provide integrated charging, protection from damage due to repetitively plugging in a charging cable, and ease of docking through a standardized connector" and another product sold on Amazon.com which "does not provide drop connection,

---

[2] For the reasons set forth in its previous order, the Court has stricken those portions of Defendant's expert reports setting forward previously undisclosed acceptable non-infringing alternatives.

[3] "To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017).

1   integrated charging and protection to the (sic) from damage due to repetitive plugging of a

2   charging cable." (*Id.* at 19–20.)  Voth confirmed with Babcock that these products were not

3   technological alternatives to the Patents-in-Suit.  (*Id.* at 20.)

4          Voth stated he was unaware of any evidence suggesting customers would have found

5   other products offered by Defendant to be acceptable alternatives to the accused products.  (*Id.* at

6   39.)  Voth discussed the claimed benefits of Defendant's products with Babcock, who was "not

7   aware of any non-infringing devices that offer the claimed featured benefits that would not

8   infringe the patent." (*Id.*)

9          The Court finds no basis for excluding Voth's opinion on this point.  Voth did not make

10  an unfounded assumption about the existence of acceptable non-infringing substitutes.  Rather,

11  Voth relied upon witness testimony and discussions with NPI's technical expert.  *Apple Inc. v.*

12  *Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014), *overruled on other grounds by Williamson*

13  *v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc) ("Consistent with Rule 703,

14  patent damages experts often rely on technical expertise outside of their field when evaluating

15  design around options or valuing the importance of the specific, infringing features in a complex

16  device."); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)

17  ("[E]xpert opinions may find a basis in part on what a different expert believes on the basis of

18  expert knowledge not possessed by the first expert.").

19         To the extent Defendant questions the factual basis of Voth's opinion, this "goes to the

20  credibility of his testimony, not the admissibility, and it is up to the opposing party to examine

21  the factual basis for the opinion in cross-examination." *In re Toyota Motor Corp. Unintended*

22  *Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal.

23  2013) (internal citation omitted); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,

24

694 F.3d 1312, 1333 (Fed. Cir. 2012) ("Verizon's disagreements are with the conclusions

reached by ActiveVideo's expert and the factual assumptions and considerations underlying

those conclusions, not his methodology. These disagreements go to the weight to be afforded the

testimony and not its admissibility.")

Defendant further argues Voth improperly assumed that patented features drove demand

for the allegedly infringing products.  (Dkt. No. 223 at 7.)  Defendant contends demand for its

products is driven by a variety of product features for which Plaintiff does not hold a patent, such

as a temperature control mechanism for which Defendant holds the patent.  (*Id.*)  Defendant

argues these non-patented features "expand[] the universe of acceptable non-infringing

substitutes."  (*Id.* at 8.)  Plaintiff argues that in formulating his opinion, Voth relied upon

evidence concerning the sales of the allegedly infringing products and discussions with Babcock

and other NPI employees.  (Dkt. No. 229 at 8.)  Plaintiff further argues Defendant's only basis

for its contention regarding the driver of demand for Defendant's products is the opinion of

Defendant's own expert.  (*Id.*)

In his report, Voth stated the market for the patented products would be defined "by the

combination of benefits encompassed by the patented devices."  (Dkt. No. 218 at 19.)  During a

deposition, Voth testified that while customers "could be looking for a myriad (sic) other

features as well" it was his understanding that the "combination of [patented] features" were

driving the purchases.  (Dkt. No. 218-3 at 90–91.)  Voth also testified Defendant's temperature

control mechanism could "[c]ertainly" be a driver of demand "in addition to the combination of

features supported by the patent."  (*Id.* at 91.)

Voth does not appear to dispute that non-patented features could have driven demand, to

some extent, for Defendant's products.  To the extent Defendant finds some contradiction

1    between Voth's report and his deposition testimony, Defendant may explore this on cross-

2    examination.  *Daubert*, 509 U.S. at 596.

3          To the extent the parties' experts dispute whether demand for the allegedly infringing

4    products was driven by patented features, non-patented features, or some combination of the two,

5    this constitutes a factual dispute between the parties' experts concerning what the evidence

6    shows and the conclusions drawn by the experts based on that evidence.  This disagreement is

7    not a basis for excluding Voth's opinion.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036,

8    1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact

9    finder, not by judicial fiat. Where two credible experts disagree, it is the job of the fact finder,

10   not the trial court, to determine which source is more credible and reliable."); *Summit 6, LLC v.*

11   *Samsung Elecs*. Co.,802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[T]he question of whether the expert

12   is credible or the opinion is correct is generally a question for the fact finder, not the court.").

13                *b.  Marketing Capacity*

14         Defendant argues that Voth improperly speculated that Defendant's customers knew

15   about Plaintiff's products because Plaintiff was a "market leader" and because Defendant paid

16   attention to Plaintiff's marketing.  (Dkt. No. 223 at 8.)  Defendant argues Voth provided no

17   comparative market or competitor analyses to justify his conclusion that Plaintiff is a market

18   leader and offers no explanation for why Defendant's customers "would pay attention to NPI just

19   because GPS did."  (*Id.*)

20         Plaintiff argues the law imposes no requirement for a patent holder to be a "market

21   leader" to recover lost profits, and that even if it did, there is no dispute that Plaintiff is in fact a

22   market leader.  (Dkt. No. 229 at 9.)  Plaintiff argues Voth considered "extensive evidence" of

23   customers evaluating Plaintiff's and Defendant's products "side-by-side, supporting his opinion

24

1    that customers would turn to NPI if GPS did not sell the infringing products." (*Id.* at 6.)

2    Plaintiff argues there is no legal requirement for Voth to provide the kind of analysis Defendant

3    proposes, and that in any event, Voth did consider the market and direct competition between the

4    parties within that market. (*Id.*)

5            Defendant's argument is based on Voth's conclusion that "various evidence" shows that

6    GPS's customers "would have likely known about NPI's GDS products as a relevant market

7    leader, and GPS strives to stay aware and be (sic) utilize ideas from GDS marketing." (Dkt. No.

8    218 at 24.)

9            Voth relied on internal GPS emails and testimony from GPS employees to support his

10   opinion that GPS views NPI's practicing RAM GDS products as the "market leader", that NPI

11   and GPS are direct competitors, and that GPS sought to emulate aspects of NPI's marketing

12   strategy. (*Id.* at 21–22.) With respect to his opinion concerning the awareness of GPS's

13   customers concerning NPI's products, Voth appears to have relied upon evidence that NPI

14   "outspends GPS significantly every year on sales and marketing" and on evidence concerning

15   the "dozens" of trade shows attended by NPI each year, through which "customers aware of GPS

16   would also be aware of NPI." (Dkt. No. 218-1 at 10–11.)

17           Voth's opinions on these points appear to be reasonably well supported. Nevertheless,

18   disputes concerning what constitutes a "market leader", whether Plaintiff was a market leader,

19   and the extent to which Defendant's customers were aware of Plaintiff's products go to the

20   assumptions and considerations underlying Voth's opinion rather than his methodology, and are

21   not a proper basis for excluding Voth's opinion. *ActiveVideo*, 694 F.3d at 1333.

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

c.  *Amount of Profit*

Defendant argues Voth improperly assumed Plaintiff would achieve 100% of Defendant's sales but for the alleged infringement.  (Dkt. No. 223 at 9.)  Defendant argues Voth's assumption is the basis for his opinion concerning what would constitute a reasonable royalty in this case, is not supported by analysis of Plaintiff's market share, and ignores other competitors.  (*Id.*)  In support of its argument, Defendant cites a report from its own expert, Frank Bernatowicz, which identified other competitors who manufacture cradle kits.  (Dkt. No. 218-2 at 26, 37.)  Bernatowicz argued Plaintiff's assumption that it would have made 100% of Defendant's sales was "unrealistic" given the "overwhelming evidence of sales drivers related to factors beside the patents-in-suit and substantial non-infringing alternatives."  (*Id.* at 40.)

Plaintiff argues that based on his analysis, Voth "reached the logical conclusion that NPI would have satisfied each of GPS's infringing sales with sales of NPI's own patented products." (Dkt. No. 229 at 11.)  Plaintiff contends Defendant offered no contrary calculation and has offered no evidence quantifying any lesser percentage.  (*Id.*)  Plaintiff further argues that a presumption exists that Defendant diverted sales directly from Plaintiff, given that "NPI and other infringers, such as GPS, are the only suppliers of the comparable products."  (*Id.*)

Defendant's argument is based on Voth's assertion that had Defendant not sold the allegedly infringing products, Plaintiff would have sold an estimated additional 288,481 units from July 11, 2017 through July 31, 2023.  (Dkt. No. 218 at 25.)  Defendant's argument is also based on Voth's deposition, during which he concluded that 100% of GPS's product sales would have been obtained by NPI if not for the alleged infringement because of the lack of acceptable non-infringing alternatives.  (Dkt. No. 218-3 at 94.)  Voth testified that for purposes of analyzing the fourth *Panduit* factor, he considered the cost difference between Plaintiff and Defendant's

products and also considered "other non-infringing products that are on the market."  (*Id.* at 87.)
Voth stated that when considering the cost difference between the products, he "assumed that
NPI would have made all of the sales that GPS made."  (*Id.* at 88.)

Voth testified similarly with respect to the durability of the products, stating he was
unaware that Plaintiff's technical or damages experts had identified any products with a
combination of features encompassed by the accused products, and there was therefore no way to
identify "any percentage that would have gone to any other party other than to NPI for any other
reason."  (*Id.* at 88–89.)  Voth offered similar testimony with respect to the reliability,
universality and scalability of the products, re-stating his assumption, "borne out by the
evidence", that the non-infringing products do not have the "primary features" that led customers
to buy NPI's products in the first place.  (*Id.* at 89–90.)  When asked during his deposition
whether he was aware of any instances of "a product made by one company that ceased being
sold and some other company get[ting] 100 percent of those sales" Voth testified that he was not
sure.  (*Id.* at 94.)

The parties' experts clearly differ concerning what percentage of Defendant's sales
would have gone to Plaintiff but for the alleged infringement.  The experts relied on different
evidence and made different assumptions in reaching their conclusions, and Voth's opinion that
Plaintiff would achieve 100% of Defendant's sales may be unreasonable.  However, the Court
cannot find that it is baseless, and "[v]igorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of proof" are the "appropriate means of attacking
shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *see also Hemmings v. Tidyman's
Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the inadequacies of a
study are more appropriately considered an objection going to the weight of the evidence rather

than its admissibility.  Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice." (internal citation omitted)).  Accordingly, the Court will not exclude Voth's opinion on this point.

### d.  Convoyed Sales

A "convoyed sale" refers to "the relationship between the sale of a patented product and a functionally associated non-patented product." *American Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008).  A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products "'together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit.'"  *Id.* (quoting *Rite–Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1998)).

Defendant argues Voth's damages opinion includes lost profits for convoyed sales of all "components and accessories" of GPS cradle kits, rather than just the allegedly infringing cases and cradles.  (Dkt. No. 223 at 10.)  Defendant contends that for Voth to include lost profits for these convoyed sales in his damages calculation, Plaintiff must establish the patented and non-patented components together constitute a functional unit and that the patented features drive demand for the unit as a whole.  (*Id.*)  Defendant argues Voth, "with virtually no analysis", assumed the accessories and components included in his damages model "work together as a functional unit with the accused covers and cradles."  (*Id.*)

Plaintiff argues Defendant sells some of its allegedly infringing products in kits where infringing covers or cradles are combined with accessory and mounting components that are intended to be used together.  (Dkt. No. 229 at 13.)  Plaintiff contends it sells its own patented products with similar accessories and mounting components, and cites a report from its technical

expert that these products operate as functional units.[4]  (*Id.*)  Plaintiff argues Defendant has not rebutted this expert report, and that Voth did provide an analysis when he opined Plaintiff may recover damages for non-patented accessories and mounting components.  (*Id.*)

In his report, Voth stated that "[w]hile kits can include non-infringing mounting components, mounting components work in conjunction with the accused cradles and covers to form a functional unit."  (Dkt. No. 218 at 26.)  Voth therefore concluded that but for Defendant's infringement, "it was reasonably foreseeable that lost sales of practicing products have also resulted in lost sales of convoyed products."  (*Id.*)  In reaching this conclusion, Voth relied on information from NPI employees Remmers and Parker, who "agreed that covers and cradles were are (sic) the primary reason customers buy practicing products, but many require mounting components in order to mount them for use."  (*Id.*)  Voth concluded, based on his analysis, that Plaintiff "suffered lost profits resulting from Defendant's sales of accused products, and has likely lost sales and profits of convoyed mounting products as well."  (*Id.* at 17.)

Voth appears to have relied in part on conversations with NPI employees for his conclusion regarding lost profits for convoyed sales.  Whether information from these employees is a sufficient basis for Voth's conclusions goes to the weight of Voth's testimony rather than its admissibility.  *ActiveVideo*, 694 F.3d at 1333.

Defendant cites the expert report of Frank Bernatowicz, who, based on discovery documents and on-line research, opined that "there is ample evidence indicating the

---

[4] Plaintiff's technical expert, James Babcock, opined the accused dock and cradle "work together as a single assembly and constitute a functional unit" and "are sold and marketed together for reasons relating to functionality, and not merely as a matter of convenience."  (Dkt. No. 208-11 at 38.)  The extent to which Voth relied on Babcock's opinion is unclear.  Regardless, the question of whether certain components form a functional unit appears to be a technical question outside Voth's scope of expertise, and Voth was not unreasonable in assuming they did for purposes of his damages analysis.

aforementioned convoyed sales are unrelated to the Accused Cradle Kits." (Dkt. No. 218-2 at

48.)  Bernatowicz further opined that Voth assumed without analysis that the convoyed sales at

issue were functionally related and "failed to look at the inverse – whether the facts of this case

point to those ancillary sales as having a non-functional relationship."  (*Id.* at 49.)  Bernatowicz

also stated that Voth assumed the Entire Market Value Rule[5] ("EMVR") is applicable to the

convoyed sales at issue, but provided insufficient analysis of the issue.  (*Id.*)

However, a disagreement between two experts, even if Bernatowicz's opinion rests on a

firmer foundation than Voth's, is not a basis for excluding Voth's report.  *Alaska Rent-A-Car,*

*Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–970 (9th Cir. 2013) ("[T]he [district] judge is

supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely

because they are impeachable . . .[t]he district court is not tasked with deciding whether the

expert is right or wrong, just whether his testimony has substance such that it would be helpful to

a jury."); *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 806 (3d Cir. 1997) ("*Daubert* does not set

up a test of which opinion has the best foundation, but rather whether any particular opinion is

based on valid reasoning and reliable methodology.").  Accordingly, the Court will not exclude

Voth's opinion regarding convoyed sales.

### 2.  Reasonable Royalty

Defendant argues that in calculating a reasonable royalty, Voth failed to consider three

comparable NPI license agreements with lower royalty rates.  (Dkt. No. 223 at 12.)  Defendant

---

[5] For the EMVR to apply, the patentee must prove that "the patent-related feature is the basis for customer demand."  *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318, 1336 (Fed. Cir. 2009) (internal citations and quotation marks omitted).  As discussed above, the extent to which patented features, non-patented features, or some mix of the two drove demand for the products in question remains disputed between the parties' experts, and Voth's underlying assumptions concerning this question can be explored by Defendant on cross-examination.

1    contends the licenses are comparable because they relate to the Patents-in-Suit and are

2    technically similar NPI inventions from the same art area, the same technological application

3    domain, the same product category, the same market and highly similar segments.  (*Id.* at 12–

4    13.)  Defendant contends these licenses contain royalty rates between 3.7% and 12.2% and are

5    more reasonable than the "outlier" 20% rate proposed by Voth.  (*Id.* at 13–14.)

6         Plaintiff argues that in formulating his opinion concerning what would constitute a

7    reasonable royalty in this case, Voth applied the 15-factor analysis set forth in *Georgia-Pacific*

8    *Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  (Dkt. No. 229 at

9    14.)  Plaintiff contends Voth reasonably concluded, based on his analysis, that the parties would

10   have agreed to a royalty rate of 20% of the apportioned, average net sales price of the accused

11   products.  (*Id.*)  Plaintiff contends Voth considered the directly competitive relationship between

12   the parties, the noncomparable license relied on by Defendant's expert, and the prior agreement

13   of record related to the asserted patents.  (*Id.*)

14        "To calculate the reasonable royalty, patentees generally consider a hypothetical

15   negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed."

16   *DataQuill Ltd. v. High–Tech Computer Corp.*, 887 F.Supp.2d 999, 1020 (S.D. Cal. 2011).  The

17   parties then attempt "to ascertain the royalty upon which the parties would have agreed had they

18   successfully negotiated an agreement just before infringement began."  *Lucent*, 580 F.3d at

19   1324–1325.  The Federal Circuit has sanctioned the use of the *Georgia–Pacific* factors to frame

20   the reasonable royalty inquiry, noting that these factors "properly tie the reasonable royalty

21   calculation to the facts of the hypothetical negotiation at issue."  *Uniloc USA, Inc. v. Microsoft*

22   *Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

23

24

1        Here, in calculating a reasonable royalty, Voth considered each of the 15 *Georgia-Pacific*

2   factors.  (Dkt. No. 218 at 45–53.)  The first two factors appear relevant here. With respect to the

3   first factor, the royalties received by the patentee for the licensing of the patent in suit, proving or

4   tending to prove an established royalty, Voth opined that the ProClip Agreement that ended

5   patent litigation for the Patents-in-Suit in 2023 "was probative of a reasonable royalty in this

6   case."  (*Id.* at 45.)  Voth's conclusion was "[b]ased on similarity in competitive positioning

7   between ProClip and GPS as large, direct competitors to NPI, similar sales volumes of accused

8   products, similar profitability of accused products, and because the ProClip Agreement was

9   reached very near trial, after years litigation when the parties likely had very good

10  understandings of the expected outcome at trial."  (*Id.*)

11       As for the second factor, the rates paid by the licensee for the use of other patents

12  comparable to the patent in suit, Voth stated he was aware of Defendant's contention that a

13  reasonable royalty rate in this case would be "the same [rate] as imposed in the NPI v. High Gear

14  Specialties, Inc."  (*Id.*)  Voth asserted he was "not aware of any evidence or testimony

15  suggesting that any technology involved in the High Gear matter is technologically or

16  economically comparable to the technology and circumstances of this case."  (*Id.*)  Voth cited the

17  opinion of Plaintiff's technical expert, James Babcock, to the effect that that "the technology in

18  the High Gear is not comparable to the patents-in-suit."  (*Id.*)

19       Voth concluded that "all eight of the *Georgia Pacific* factors that favor either party favor

20  NPI, while none favors GPS."  (*Id.* at 55–56.)  Voth also considered other factors, including the

21  20%[6] royalty rate contained in the 2023 agreement between NPI and ProClip, the relationship

22

23  _____

    [6] Voth contends ProClip actually paid a 24.6% or 26.3% royalty for past sales of accused
24  products in a $10 million payment.  (Dkt. No. 218 at 45.)

1    between the parties, the lack of alternative technologies for accomplishing the same benefits,

2    profitability of the relevant products, and relative importance of the technology of the Patents-in-

3    Suit.  (*Id.* at 53–54.)  Voth explained his assumptions with respect to the royalty structure and

4    base, and concluded the hypothetical negotiators would have arrived as a royalty rate of 20% of

5    the Smallest Saleable Patent Practicing Unit ("SSPPU") average net selling prices from 2017

6    through July 2023.  (*Id.* at 54.)

7    The evidence Defendant cites to support its argument regarding the three allegedly

8    comparable licenses is Bernatowicz's October 11, 2023 rebuttal report.[7]  In the report,

9    Bernatowicz reviewed four licensing agreements entered into by NPI and other parties, including

10   the agreement between NPI and ProClip.  (Dkt. No. 218-2 at 58–59.)  Based on his review,

11   Bernatowicz opined the 2019 license agreement between NPI and Arkon was "highly

12   comparable" for purposes of determining reasonably royalties, whereas the other

13   agreements "have indicia of much lower comparability based on the economic, market and

14   technological subject matter of those agreements."  (*Id.* at 59.)

15   "In determining a reasonable royalty, parties frequently rely on comparable license

16   agreements."  *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372 (Fed. Cir.

17   2020).  However, the "licenses relied on by the patentee in proving damages [must be]

18   sufficiently comparable to the hypothetical license at issue in suit."  *Lucent,* 580 F.3d at 1325.

19   A patentee cannot rely on license agreements that are "radically different from the hypothetical

20   agreement under consideration" to determine a reasonable royalty.  *Uniloc*, 632 F.3d at 1316

21   (quoting *Lucent*, 580 F.3d at 1327).  "Assessing the comparability of licenses requires a

22

23   ───────────────

[7] For the reasons set forth in its previous order, the Court has stricken Bernatowicz's opinion

24   regarding reasonable royalties.  The Court has also precluded Defendant from relying upon the
     noncomparable NPI-Arkon license.

ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY OF DREW E. VOTH (DKT. NO. 214) - 18

1    consideration of whether the license at issue involves comparable technology, is economically

2    comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-*

3    *Rad*, 967 F.3d at 1372–1373.

4         "[T]he issue of comparability is often one of sufficiency of the evidence, not

5    admissibility." *Id.* at 1373; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227

6    (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight

7    of the evidence, not its admissibility.")  The dispute between the parties' experts involves which

8    of the four licensing agreements cited in the experts' reports is more comparable to the

9    hypothetical license at issue for purposes of the reasonable royalty analysis.  The Court finds the

10   dispute here is fundamentally about the degree of comparability between the hypothetical license

11   and the four licenses previously negotiated by NPI, which is a "factual issue[ ] best addressed by

12   cross examination and not by exclusion." *ActiveVideo*, 694 F.3d at 1333 (finding the district

13   court did not abuse its discretion by failing to exclude the testimony of a damages expert who

14   relied on two license agreements, one of which did not involve the patents or technologies in the

15   case).  Accordingly, the Court declines to exclude Voth's opinion on this point.

16        Defendant further argues Voth's royalty analysis is deficient because he includes all

17   GPS's sales for accused kits that include non-accused components and accessories in the royalty

18   base.  (Dkt. No. 223 at 15.)  Defendant contends Voth has not established "that the non-accused

19   components and accessories operate together with the accused cradles and covers as a functional

20   unit."  (*Id.*)  For the reasons discussed above, *supra* III.B.1.d, the Court will not exclude Voth's

21   opinion regarding convoyed sales.

22

23

24

ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY OF DREW E. VOTH (DKT. NO. 214) - 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### IV.   ORDER

Defendant's motion to exclude the report and testimony of Drew E. Voth (Dkt. No. 214) is DENIED.

Dated this 30th day of July, 2024.

David G. Estudillo
United States District Judge