1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

11

NATIONAL PRODUCTS INC,

CASE NO. 2:20-cv-00428-DGE

12

                    Plaintiff,

          v.

ORDER ON MOTION FOR
SANCTIONS AGAINST DOVEY
AND KING (DKT. NO. 314)

13

INNOVATIVE INTELLIGENT
PRODUCTS LLC,

14

15

                    Defendant.

16

17        Plaintiff National Products Inc. ("NPI") moves for sanctions against non-party Jack H.

18   Dovey Jr. ("Dovey") and counsel for Defendant, Joshua King ("King").  (Dkt. No. 314.)  For the

19   reasons set forth below, NPI's motion is GRANTED in part and DENIED in part.

20               **I.        FACTUAL AND PROCEDURAL BACKGROUND**

21        This case has a lengthy procedural history.  Relevant here, on March 20, 2020, NPI, a

22   designer and manufacturer of docking cradles and protective cover products, filed a complaint in

23   this Court alleging the products of another company, Innovative Intelligent Products LLC d/b/a

24

GPS Lockbox ("GPS Lockbox" or "GPS"), infringed upon two of NPI's patents.[1]  (Dkt. No. 1.)
Dovey is the founder and managing partner of GPS, and King is the lead counsel for GPS.  (Dkt.
Nos. 15; 136 n.1; 315-1 at 4–5.)

On September 17, 2024, the Court issued an order granting in part NPI's motion for
summary judgment, finding, among other things, GPS's products infringed NPI's patents,
specifically claim 11 of the '026 patent and claims 10 and 14–16 of the '334 patent.  (Dkt. No.
259.)  Following the Court's ruling, the parties agreed to bifurcate issues to streamline the trial.
(Dkt. Nos. 269, 270.)  The Court set a trial for May 5, 2025 on damages and willfulness as to
claim 11 of the '026 patent.  (Dkt. Nos. 262, 270.)  The parties proceeded through the pre-trial
process, filing proposed voir dire, a joint statement of the case, proposed jury instructions, and
motions in limine.  (*See* Dkt. Nos. 271, 272, 273, 274, 275, 276.)

Several weeks before the trial was set to begin, GPS initiated receivership proceedings in
King County Superior Court, filing a petition seeking to have Turnford Consulting LLC
("Turnford") appointed as a general receiver for the company.  (Dkt. No. 285.)  On March 31,
2025, the King County Superior Court issued an order granting the petition.  (*Id*.)  On April 1,
2025, Turnford informed the Court of the order and asserted that because Turnford had been
appointed Receiver for Defendant, this proceeding was stayed as to GPS.  (Dkt. No. 285 at 1)
(*See* Wash. Rev. Code § 7.60.110) ("[T]he entry of an order appointing a general receiver or a
custodial receiver with respect to all of a person's property shall operate as a stay[.]").

On April 2, 2025, the Court issued an order directing the parties to submit additional
briefing concerning whether state receivership proceedings under Washington Revised Code

---

[1] NPI filed an Amended Complaint on April 21, 2020, and a Second Amended Complaint on
November 11, 2020.  (Dkt. Nos. 14, 43.)

1    § 7.60.110 automatically stay federal cases operating with federal question jurisdiction.  (Dkt.

2    No. 286.)  On April 11, 2025, the Court found the state receivership proceedings did not

3    automatically stay this litigation.  (Dkt. No. 299.)  The Court ordered that all pre-trial deadlines

4    would remain in place.  (*Id.*)  On April 15, 2025, GPS informed the Court that it had, that day,

5    filed a Chapter 7 bankruptcy petition in the United Stated Bankruptcy Court for the Western

6    District of Washington.  (Dkt. No. 300.)  On April 16, 2025, the Court issued an order staying

7    the case pursuant to 11 U.S.C. §362(a)(1).[2]  (Dkt. No. 301.)

8         On May 6, 2025, NPI filed a motion seeking limited relief from the Court-ordered stay,

9    so that it could file motions for sanctions against Dovey and King.  (Dkt. No. 303.)  On July 14,

10   2025, the Court granted NPI's motion, finding it had the authority to entertain a motion for

11   sanctions against non-parties Dovey and King notwithstanding the bankruptcy stay in force as to

12   GPS.  (Dkt. No. 309.)  The Court ordered NPI to file a motion for sanctions within 30 days.  (*Id.*

13   at 7.)  The Court granted a stipulated motion to extend this deadline (Dkt. Nos. 312, 313), and

14   NPI filed its motion for sanctions on August 18, 2025.  (Dkt. No. 314.)  Dovey and King

15   responded to NPI's motion on September 8, 2025.  (Dkt. Nos. 316, 320.)

## II.    LEGAL STANDARD

17        The Court has the inherent authority to impose sanctions against non-parties to curb

18   litigation misconduct.  *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 282 (9th Cir. 1996); *Leon v.*

19   *IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *Corder v. Howard Johnson & Co.*, 53 F.3d

20   225, 232 (9th Cir. 1995) ("[E]ven in the absence of statutory authority, a court may impose

_____

[2] On April 22, 2025, NPI filed a new case, asserting Dovey directly infringed and induced
infringement of claim 11 of the '026 patent, the same claim and patent at issue in this case.
*National Products Inc. v. Dovey*, Case No. 2:25-cv-00730-DGE.  On August 26, 2025, the Court
granted Dovey's motion to dismiss that case.  (*Id.* at Dkt. No. 19.)

attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices.").  The Court may also sanction attorneys under its inherent authority.  *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("The power of a court over members of its bar is at least as great as its authority over litigants."); *Barnd v. City of Tacoma*, 664 F.2d 1339, 1342 (9th Cir. 1982) ("A trial court's inherent powers unquestionably include the power to assess attorney's fees against any counsel who willfully abuses judicial process or otherwise conducts litigation in bad faith.").

The Court's inherent powers come from the "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal citation omitted).  "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44.  This power is "both broader and narrower than other means of imposing sanctions." *Id.* at 46.  "The inherent power of the court extends to a full range of litigation abuses and reaches conduct both before the court and beyond the court's confines." *Anchondo v. Anderson*, Case No. CV 08–202 RB/WPL, 2011 WL 4549279, at *2 (D.N.M. Sept. 29, 2011) (citing *Chambers*, 501 U.S. at 46, 57.)  However, before imposing sanctions under its inherent authority, the Court must make an express finding that the sanctioned party's behavior "constituted or was tantamount to bad faith." *Leon*, 464 F.3d at 962 (internal citation omitted).

Bad faith includes "a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).  "[B]ad faith, including conduct done vexatiously, wantonly, or for oppressive reasons, requires proof of bad intent or improper purpose." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021).  Bad faith "is not restricted to situations where the action was filed in bad faith" and may be found "in the conduct of the litigation." *Id.*  "Upon

a finding of bad faith, courts can levy an assortment of sanctions under their inherent power, including monetary awards, attorneys' fees, adverse inference jury instructions, and even dismissal of claims." *Knickerbocker v. Corinthian Colleges*, 298 F.R.D. 670, 677 (W.D. Wash. 2014).

In addition to its inherent authority, the Court may sanction any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" by requiring that attorney to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To impose sanctions under this section, the Ninth Circuit requires "a finding of subjective bad faith." *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass." *Id.* (citations omitted).

## III.    DISCUSSION

NPI alleges Dovey and King, working "hand-in-hand" on GPS's litigation defense, have marred this proceeding with misconduct by asserting inequitable conduct and invalidity defenses based on allegations they knew to be false and filing frivolous motions and engaging in gamesmanship to delay Defendant's recovery, most notably by filing for bankruptcy on the eve of trial. (Dkt. No. 314.) NPI asks the Court to impose sanctions upon Dovey and King under its inherent authority, and to impose sanctions against King pursuant to 28 U.S.C. § 1927. (*Id.* at 27–28.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### A.  Invalidity and Inequitable Conduct Claims

1.  <u>Invalidity</u>[3]

NPI alleges Dovey and King filed counterclaims and declarations they knew to be false in this and two other patent cases.  NPI contends that after Dovey and King's investigation revealed a GPS product, the magnetic Ultra Pro 7 ("Magtron UP7"), did not exist until June 2014, the pair nevertheless asserted that GPS had publicly displayed and sold the product in January 2014 so they could argue it invalidated NPI's patents.  (Dkt. No. 314 at 8–20.)  NPI argues Dovey and King did this because NPI's patents claim priority to a patent application filed on February 24, 2014,[4] meaning that for a product to be invalidating prior art it must have been publicly available before that date.[5]  (*Id.* at 8.)

NPI asserts the Magtron UP7 was a modified version of the original Ultra Pro 7 and included a magnetic adapter that had a plug inside and contacts on the exterior of the cover. (Dkt. No. 314 at 8.)  NPI claims that because the original Ultra Pro 7 lacked such an adapter, GPS never asserted it invalidated NPI's patents.  (*Id.* at 9.)  NPI argues that in June 2020, Dovey reviewed GPS's records and documented his conclusion that the Magtron magnetic adapter did not exist until May 2014 and first entered production in December of that year.  (*Id.* at 10.)

NPI contends GPS acted in bad faith when it asserted, in its Amended Answer filed on November 8, 2021, that "[d]uring early February 2014, and prior to February 24th, 2014, GPS

---

[3] The Court granted NPI's motion for summary judgment of no invalidity based on anticipation, obviousness, or lack of written description.  (Dkt. No. 259 at 18–26, 34.)

[4] The Court also granted NPI's motion for summary judgment as to its contention that claims 1 and 11 of the '026 patent and claims 1 and 3 of the '309 patent have an effective filing date of February 24, 2014.  (Dkt. No. 259 at 28, 35.)

[5] Under 35 U.S.C. § 102(a) an inventor is not entitled to a patent if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention," subject to certain exceptions.

1  Lockbox offered for sale and otherwise made public the UP7 with Magtron magnetic connection

2  system." (Dkt. Nos. 78 at 26; 314 at 13.)  NPI contends GPS's invalidity counterclaims relied

3  upon images from GPS marketing materials published in June 2014, which displayed images of

4  the Magtron UP7 with a magnetic connection system.  (Dkt. No. 314 at 12–14.)

5      NPI contends Dovey and King presented their Magtron UP7 defenses in two other, later-

6  filed patent cases, each time relying on the contention that GPS produced versions of the UP7

7  product with the magnetic connection system as early as January 2014.  (*Id.* at 15.)  NPI argues

8  Dovey and King persuaded GPS employees and vendors, who had no personal knowledge

9  concerning when the product was first available, to support this contention.  (*Id.* at 16.)

10      NPI argues that after Dovey and King were required to produce GPS's records in

11  discovery, they knew their contention that the Magtron UP7 existed in January 2014 would no

12  longer be tenable.  (*Id.* at 17.)  NPI contends that once this became clear to Dovey and King, they

13  modified their invalidity contention by asserting the version of the Magtron UP7 on sale in

14  January 2014 was not a final version of the product, but rather a "MacGyvered" prototype

15  created in-house by GPS.  (*Id.*)  NPI contends that once Dovey and King pivoted to this new

16  story, they attempted to alter the testimony of several witnesses to be more consistent with this

17  new version of events.  (*Id.* at 17–18.)

18              2.  Inequitable Conduct

19      NPI argues Dovey and King "leveraged" their contention that the Magtron UP7 existed

20  prior to February 2014 to allege NPI CEO Jeffrey Carnevali engaged in inequitable conduct.[6]

21

22  ---

    [6] "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars
23  enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1286
    (Fed. Cir. 2011).  "To prevail on the defense of inequitable conduct, the accused infringer must
24  prove that the applicant misrepresented or omitted material information with the specific intent
    to deceive" the PTO.  *Id.* at 1287.

(*Id.* at 14.)  NPI asserts Dovey relied upon this contention to falsely claim that he met with representatives of NPI at NPI's headquarters in March or April 2014, during which Dovey claims he demonstrated the Magtron UP7's features for NPI employees, including the Magtron magnetic adapter.  (*Id.*)  In its Amended Answer, GPS contends two NPI employees passed along information about the Magtron UP7 to Carnevali, who then copied the Magtron UP7's features into NPI's patent filings without informing the U.S. Patent and Trademark Office ("PTO").[7]  (Dkt. No. 78 at 68–73.)

NPI argues Dovey and King's story about a meeting at NPI's headquarters in March or April 2014 cannot be true because NPI personnel moved out of the building in October 2013 as part of a long-planned renovation.  (Dkt. No. 314 at 18.)  NPI contends demolition of the building was completed in May 2014, and that NPI employees moved into the new building in early 2015.  (*Id.*)  NPI argues defending against Dovey and King's false Magtron UP7 contentions imposed an "immense" burden on the company in this case and the two other cases in which GPS asserted them.  (*Id.* at 20.)

### 3.  King

King argues NPI has presented no evidence he asserted facts he knew to be false.  (Dkt. No. 320 at 2.)  King contends he did not act in bad faith with respect to GPS's invalidity and inequitable conduct defenses.  (*Id.* at 7.)  King claims he had a reasonable, good faith belief that Dovey's assertions concerning the Magtron UP7 were correct, despite certain inconsistencies in

---

[7] The Court considered GPS's inequitable conduct defense at the summary judgment stage, finding that even if the UP7 did exist and the alleged meeting did take place, GPS provided no evidence on the record of knowledge or specific intent to deceive the PTO.  (Dkt. No. 259 at 28–30.)  The Court granted NPI's motion for summary judgment of no inequitable conduct.  (*Id.* at 30, 35.)

1   Dovey's testimony. [8]  (Dkt. No. 321 at 3–4.)  King asserts he relied upon the testimony of

2   numerous witnesses, including Dovey, that a meeting occurred between Dovey and NPI

3   employees at NPI's headquarters in March or April of 2014.  (*Id.* at 2–3.)  King claims he

4   independently verified Dovey's testimony by interviewing other witnesses outside Dovey's

5   presence.  (*Id.* at 4–5.)  Dovey cites excerpts of testimony from several of these individuals as

6   evidence that the 2014 meeting at NPI's headquarters took place.  (*Id.* at 5–9.)

7                                  4.   Dovey

8          Dovey argues testimony from former GPS vendors and employees corroborates his claim

9   that the Magtron UP7 prototype existed in January 2014.  (Dkt. No. 316 at 4–5.)  Dovey

10  concedes he and King knew the Magtron UP7 was created in June 2014, but argues the June

11  2014 version of the device was the production model, not the prototype, and claims the magnet

12  used in the prototype was purchased in January 2014.  (*Id.* at 6.)  Dovey argues a meeting

13  concerning the Magtron UP7 did occur at NPI's headquarters in March or April of 2014, and

---

[8] NPI argues the Court should disregard the declaration submitted by King, the vast majority of which "make[s] legal arguments, interpret[s] facts, recount[s] facts for which he has no personal knowledge, or present[s] the testimony of others."  (Dkt. No. 324 at 4 n. 1.)  "As a general matter, declarations and affidavits have one purpose—to provide factual support for factual assertions in motions and briefs."  *Jackson v. Kroger Co.*, Case No. 2:24-CV-02128-LK, 2025 WL 346640, at *1 (W.D. Wash. Jan. 30, 2025); *see also Moussouris v. Microsoft Corp.*, Case No. C15-1483JLR, 2018 WL 3328418, at *10 (W.D. Wash. June 25, 2018) (content in a declaration other than factual assertions supported by personal knowledge "goes beyond what is appropriate for a declaration.").

"Declarations . . . should not be used to make an end-run around the page limitations . . . by including legal arguments outside of the briefs."  *King Cty. v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002); *Singh v. Soraya Motor Co.*, Case No. C17-0287-JCC, 2017 WL 8728124 at *2 (W.D. Wash. Oct. 26, 2017 ("Declarations are not the place for legal argument.").  King's declaration contains legal arguments, cites deposition testimony and emails from other individuals, and otherwise refers to matters outside his personal knowledge.  To the extent King's declaration contains assertions not supported by personal knowledge and attempts to circumvent the Court's word limits by presenting legal arguments, the Court would be justified in disregarding it.  However, in the interests of justice, and given the potential consequences if the Court grants NPI's motion, the Court will consider King's declaration.

1    cites a declaration from a former GPS employee that corroborates his version of events.  (*Id.* at

2    6–8.)

3              5.   Analysis

4                   *i.  Invalidity*

5              The record contains conflicting accounts concerning whether the Magtron UP7 was on

6    sale or available to the public prior to February 24, 2014, the effective filing date of NPI's

7    patents.  Dovey testified the prototype of the UP7 was created when GPS principal Joe Todrzak

8    "basically took the Dae Han[9] products apart and did his magic with epoxy and plastic and

9    MacGyvered them together so they would plug in" to the existing Ultra Pro 7 case.  (Dkt. No.

10   315-14 at 7.)  Dovey stated the first version of the UP7 product utilizing the Dae Han magnetic

11   connection system "was completed and ready to be shown to the public at least as early as

12   January 27, 2014."  (Dkt. No. 304-4 at 5.)  Dovey testified he first offered for sale the UP7

13   incorporating the Dae Han magnetic connection system between January 27, 2014 and February

14   24, 2014 and made other public disclosures to potential customers, manufacturers, and investors.

15   (*Id.* at 8–10.)  Dovey contends GPS first debuted the UP7 with a magnetic connection system at

16   the Sprint Managers' Meeting in Seattle, a trade show which was held from February 24, 2014 to

17   February 26, 2014.  (Dkt. No. 316 at 4.)  In its Amended Answer, GPS asserts that during the

18   trade show it "presented, offered for sale and otherwise made public" three different products

19   which incorporated the Magtron magnetic connection system, including the UP7, at a display

20   booth.  (Dkt. No. 78 at 26, 45.)

21             Dovey asserts this version of events is corroborated by a declaration from GPS vendor

22   Steven Jacobs, who claims that in January 2014 Dovey "showed [him] a new Ultra Pro 7 (UP7)

23   _____

24   [9] Magtron is a trade name for Dae Han.

1    product that was equipped with a magnetic connection system."  (Dkt. Nos. 209-23 at 3; 316 at

2    3–4.)  Dovey also cites the declaration of Michael Fudge, who previously worked at GPS vendor

3    Cascade Plastics, and who also asserted, using identical language, that Dovey showed him a UP7

4    equipped with a magnetic connection system in January 2014.  (Dkt. Nos. 209-24 at 2–3; 316 at

5    5.)  Dovey cites the testimony of former GPS employee Jack Day, who testified that GPS "put

6    together" the UP7 with the magnetic connector in January 2014 and began "the actual

7    manufacturing and implementation" of the UP7 in May 2014.  (Dkt. Nos. 316 at 5; 318-6 at 5.)

8        NPI questions whether the "MacGyvered" prototype was actually available in January

9    2014.  NPI contends these "biased" statements from Dovey's "inner circle" are unreliable, and

10    asks the Court to ignore their statements, which NPI asserts were the product of Dovey and

11    King's influence.  (Dkt. No. 324 at 14.)  NPI contends there is no documentary evidence, beyond

12    the statements of Dovey's employees and associates, to substantiate the existence of a prototype

13    magnetic UP7 in January 2014.  NPI cites testimony from Dovey in which he appears to

14    acknowledge he has no photographic evidence that the prototype UP7 existed.  (Dkt. Nos. 315-1

15    at 6; 324 at 8; 325-1 at 6–7.)

16        NPI further cites the deposition of Kristopher Gebow, GPS's primary designer, who

17    testified that as of February 14th, 2014, GPS had yet to select which magnetic connector it was

18    going to use in its lockboxes, nor had it selected which magnetic connector manufacturer would

19    make the connector.  (Dkt. No. 209-1 at 7, 8.)  Gebow testified that as of April 6, 2014, design

20    work was still ongoing at GPS to incorporate the Magtron magnetic connector into the Ultra Pro

21    7.  (*Id.* at 15.)  Gebow further testified that as of April 9, 2014, he had neither seen nor received a

22    prototype of the Magtron connector.  (*Id.* at 16.)  Gebow stated he was unsure when the design

23    work to incorporate the Magtron magnetic connection system into the Ultra Pro 7 was finished,

24

1    but testified it was possible GPS created a prototype after April 14, 2014.  (*Id.* at 17.)  Gebow

2    testified incorporation of the Magtron connection system into the final version of the UP7

3    happened sometime after April 14, 2014.  (*Id.*)

4         Before the Court can impose the sanctions requested by NPI, it must make an explicit

5    finding that Dovey and King acted in bad faith in presenting GPS's invalidity counterclaim.  *Am.*

6    *Unites*, 985 F.3d at 1090 ("[B]ecause a district court's inherent powers are so potent, [the Ninth

7    Circuit] require[s] that when a court imposes sanctions based on bad faith, the court must make

8    an explicit finding that the sanctioned party's conduct 'constituted or was tantamount to bad

9    faith.'") (internal citations omitted).  "The bad faith requirement sets a high threshold[.]"  *Primus*

10   *Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997).

11        "The Ninth Circuit has not addressed whether a movant must show bad faith by a

12   preponderance of the evidence or clear and convincing evidence."  *Harris v. JFC Int'l Inc.*, Case

13   No. 21-CV-01536-LK, 2023 WL 3818463, at *9 (W.D. Wash. June 5, 2023), citing *Lahiri v.*

14   *Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).  However, "it is

15   clear that a bad faith finding supported by clear and convincing evidence will suffice."  *See*

16   *Knickerbocker v. Corinthian Colls.*, 298 F.R.D. 670, 677 (W.D. Wash. 2014).

17        NPI has presented, at the very least, a colorable argument that a version of the UP7 with a

18   magnetic connector was not on sale or otherwise available to the public prior to February 24,

19   2014.  The Court notes that virtually all the evidence that a version of UP7 with a magnetic

20   connector existed before the relevant filing date appears to come from Dovey and his associates.

21   Further, even if such a device did exist, the record raises serious questions concerning whether

22   the alleged "MacGyvered" prototype, which Dovey asserted was held together with "[b]aling

23   wire and gum" (Dkt. No. 325-1 at 6), was on sale or otherwise available to the public in any

24

1    meaningful sense before February 24, 2014.  *See e.g., Hamilton Beach Brands, Inc. v. Sunbeam*

2    *Products, Inc.*, 726 F.3d 1370, 1374 (Fed. Cir. 2013) (noting that for the "on-sale" bar of 35

3    U.S.C. § 102(a) to invalidate a patent, two conditions must be satisfied before the critical date:

4    (1) the claimed invention must be the subject of a commercial offer for sale and (2) the invention

5    must be ready for patenting.)

6         However, the Court cannot find that Dovey and King acted in bad faith in presenting

7    invalidity counterclaims premised on the existence of a UP7 with a magnetic connector prior to

8    the relevant date.  In order to clear the high bar necessary for establishing bad faith, NPI would

9    need to establish Dovey and King acted with bad intent or improper purpose in asserting, and

10   continuing to assert, counterclaims based on facts they knew to be false.  While NPI has raised

11   serious questions concerning whether GPS made available a product prior to February 24, 2014

12   that could have invalidated NPI's patents, it has not met its burden to establish that Dovey and

13   King acted in bad faith in presenting GPS's invalidity counterclaims.  Finding that Dovey and

14   King acted in bad faith would require a finding that they, along with several other individuals,

15   submitted declarations they knew to be false in this and two other patent cases, and that all these

16   individuals have continued to lie concerning the factual basis for GPS's invalidity counterclaims.

17   Despite the somewhat shaky foundation upon which GPS's narrative rests, NPI has not

18   established Dovey, King, or their associates knowingly deceived the courts to this extent.

19                                    *ii.  Inequitable Conduct*

20        With respect to GPS's inequitable conduct counterclaims, Dovey and King argue GPS's

21   principals visited NPI's headquarters in March or April of 2014 and showed the UP7 with its

22   magnetic connection system to NPI.  (Dkt. Nos. 78 at 45; 316 at 6–8; 321 at 2–10.)  NPI argues

23   GPS's inequitable conduct claim was made in bad faith because the building in which NPI and

24

1    GPS principals allegedly met was closed for demolition prior to March 2014.  (Dkt. No. 314 at

2    18.)  NPI contends demolition of the building was completed in May 2014, and that NPI

3    employees moved into the new building in early 2015.  (*Id.*)

4         The record confirms that on October 23, 2013, King County granted NPI a demolition

5    permit for its headquarters.  (Dkt. Nos. 173-16 at 2; 209-26.)  NPI employees were instructed to

6    prepare their items to move out of the building on October 25, 2013.  (Dkt. No. 209-25 at 3.)  On

7    February 6, 2014, King County approved construction of a 3,750 square foot second floor

8    addition and construction of a new parking lot.  (Dkt. No. 209-26 at 5.)  NPI submitted a

9    photograph, taken April 3, 2014, of NPI's headquarters building.  (Dkt. No. 173-17.)  The

10   photograph depicts a partially demolished building which has unstable exterior walls, a missing

11   roof, and boarded up windows.  (*Id.*)  According to King County, demolition of the building's

12   exterior walls was complete by May 23, 2014.  (Dkt. No. 318-5.)

13        Dovey and King question NPI's assertion that its headquarters was demolished by the

14   time of the alleged meeting and argue the meeting could theoretically have taken place during

15   the timeframe alleged, noting that King County did not approve demolition of the building until

16   February 26, 2014 and that demolition of the building's exterior walls was not completed until

17   May 23, 2014.  (Dkt. Nos. 316 at 6; 321 at 9–10.)

18        In support of his contention that the meeting took place, Dovey cites deposition testimony

19   from former GPS employee Jack Day, as well as a declaration from Day which Dovey claims

20   Day "prepared himself, and which he did not discuss with [ ] Dovey."  (Dkt. No. 316 at 7.)  In

21   his declaration, Day asserts that "[i]n about March or April 2014" he helped Dovey and Joe

22   Todrzak "prepare for, attend, and return from a meeting between them and two persons at RAM,

23   also known as National Products, Inc."  (Dkt. Nos. 138 at 2; 318-6 at 6.)  Day stated he helped

24

1    Dovey and Todrzak prepare a box with a sample of the UP7 with a magnetic charger inside.

2    (Dkt. No. 138 at 2.)  Day stated he understood there were two people at meeting from NPI

3    because he was told this after the meeting by Dovey and Todrzak, but does not recall either

4    Dovey or Todrzak discussing any other specific information about their alleged meeting.  (*Id.*)

5            Despite being essential to GPS's inequitable conduct counterclaim (*see* Dkt. No. 78 at

6    27–29, 68–73), GPS has not produced any evidence, beyond the equivocal statements of its own

7    employees, to support its contention that the March/April 2014 meeting took place.  GPS has not

8    stated the exact date when this meeting took place, and has not presented any other objective

9    evidence, such as emails,[10] text messages or travel records to substantiate Dovey's account of the

10   alleged meeting.  Dovey himself acknowledges he has no contemporaneous documents that

11   would establish which products were shown to NPI at the alleged meeting.  (Dkt. No. 315-1 at

12   6.)

13           Dovey's version of events, while theoretically possible, lacks objective evidence to

14   support it and is, at best, highly implausible.  Under Dovey's account, after NPI instructed its

15   employees to leave its headquarters building in late October 2013, it invited Dovey and Todrzak

16   to a meeting at that same building, despite knowing it would be demolished.  Even after King

17   County approved demolition of the building and NPI's construction plan in February 2014, NPI,

18   Dovey, and Todrzak decided to move forward with the meeting, despite the potential danger this

19   would pose to their safety.  Dovey's assertion that a meeting took place in the building in March

20

21   _____

22   [10] In filing a motion to compel production of NPI's calendars, which GPS claimed would
     confirm the meeting took place, GPS asserted production of the calendars was not actually
23   necessary because "the emails [already produced] demonstrate that the meeting and the magnetic
     UP7 disclosure took place[.]" (Dkt. No. 165 at 10.)  Neither Dovey nor King cite these emails in
24   their responses.

ORDER ON MOTION FOR SANCTIONS AGAINST DOVEY AND KING (DKT. NO. 314) - 15

1  or April of 2014 is even more unpersuasive given that the building lacked a roof, windows, and

2  four sturdy walls no later than April 3, 2014.

3      Moreover, GPS had to prove that NPI (or its CEO Carnevali) "acted with specific intent

4  to deceive the PTO" to prevail on their inequitable conduct claim.  *See Therasense*, 649 F.3d at

5  1287.  Yet, as previously pointed out, GPS "provided no evidence on the record of knowledge or

6  specific intent to deceive the PTO."  (Dkt. No. 259 at 30.)  Thus, King and Dovey, on behalf of

7  GPS, advanced a theory unsupported by any evidence.

8      Dovey and King's presentation of a highly implausible meeting as the basis for GPS's

9  inequitable conduct counterclaim together with the absence of any evidence NPI acted with a

10  specific intent to deceive the PTO constitutes bad faith.  They lacked a plausible basis to advance

11  the inequitable conduct counterclaim yielding the conclusion that they knowingly or recklessly

12  raised and advanced a frivolous counterclaim.  *See In re Keegan*, 78 F.3d at 436 ("Bad faith is

13  present when an attorney knowingly or recklessly raises a frivolous argument[.]"); *see also*

14  *Raydiant Oximetry, Inc. v. ALC Med. Holdings LLC*, Case No. 25-CV-00392-VC, 2025 WL

15  3022882 at *10–*11 (N.D. Cal. Oct. 29, 2025) (awarding sanctions under § 1927 and the Court's

16  inherent authority against a defendant and defendant's attorneys who "exploded the scope of the

17  matter" by "continuing to pursue frivolous counterclaims . . . well past the point of reason.").

18      The Court finds it appropriate to impose sanctions on Dovey under its inherent authority.

19  Many courts have coalesced around a two-part test to determine whether it is appropriate to

20  sanction a non-party: to be subject to the Court's inherent power to sanction, a non-party not

21  subject to court order must "(1) have a substantial interest in the outcome of the litigation; and,

22  (2) substantially participate in the proceedings in which he interfered.'" *Env't World Watch, Inc.*

23  *v. Walt Disney Co.*, Case No. CV094045DMGPLAX, 2016 WL 11756799, at *3 (C.D. Cal. May

24

1   11, 2016) (quoting *Helmac Prods. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 568 (E.D.

2   Mich. 1993).  Courts have often found that sanctions are appropriate against a chief executive

3   under this test, as principal officers typically have a substantial interest in the outcome of the

4   underlying litigation and participate substantially in the proceedings.  *Helmac*, 150 F.R.D. at

5   568; *Anchondo v. Anderson, Crenshaw & Assocs., LLC*, Case No. CV 08-202 RB/WPL, 2011

6   WL 4549279, at *6 (D.N.M. Sept. 29, 2011), aff'd sub nom. *Anchondo v. Dunn*, 511 F. App'x

7   736 (10th Cir. 2013).  Dovey does not appear to dispute that the Court can sanction him under its

8   inherent authority.  (*See* Dkt. No. 316.)  The Court finds Dovey, the founder and managing

9   partner of GPS, substantially participated in advancing GPS's counterclaims.  (Dkt. Nos. 304-1;

10  304-4.)

11          With respect to King, his repeated statements that this meeting occurred, for the apparent

12  purpose of permitting GPS to assert an otherwise non-meritorious counterclaim, justifies

13  imposing sanctions against him under the Court's inherent authority.  *Fink*, 239 F.3d at 993

14  ("[A]n attorney's reckless misstatements of law and fact, when coupled with an improper

15  purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain

16  tactical advantage in another case, are sanctionable under a court's inherent power.").

17          King's claim that he relied upon statements from Dovey and GPS employees and vendors

18  concerning the alleged meeting is unpersuasive given the implausible scenario under which the

19  meeting supposedly occurred.  And in the absence of evidence indicating a specific intent to

20  deceive the PTO, the purpose for advancing the existence of the alleged meeting was for no other

21  purpose other than to advance a frivolous claim.  "An attorney is entitled to rely on his or her

22  client's statements as to factual claims when those statements are *objectively reasonable*."

23  *Calloway v. Marvel Entm't Grp.*, 854 F.2d 1452, 1470 (2d Cir. 1988), *rev'd in part on other*

24

*grounds sub nom.*, *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989) (emphasis added).  Here, King continued to rely on his client's representations past that point where he should have questioned the plausibility of Dovey's account.  *In re Girardi*, 611 F.3d 1027, 1064 (9th Cir. 2010) (Attorneys have a "duty [under Section 1927] to correct or withdraw litigation positions after it becomes obvious that they are meritless."); *Nassau–Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 118 F.R.D. 45, 48 (S.D.N.Y.1987) ("To decide if the attorney may rely solely on the client, the lawyer should determine if knowledge thereof is direct or hearsay and check closely the plausibility of the client's account.").

Accordingly, the Court finds it appropriate to impose sanctions against both Dovey and King, under its inherent authority for acting in bad faith with respect to GPS's inequitable conduct claim.  Based on its finding of bad faith, the Court also finds it appropriate to impose sanctions on King pursuant to 28 U.S.C. § 1927.  *In re Keegan*, 78 F.3d at 436.

### B.  Litigation Conduct

NPI argues Dovey and King used a variety of tactics to delay resolution of this case, including: 1) re-asserting dismissed claims; 2) asserting meritless claims construction positions; 3) improperly seeking disqualification of NPI's counsel and seeking an indefinite stay of this case; 4) violating discovery rules; and 5) asserting a new inequitable conduct theory at the summary judgment deadline.  (Dkt. No. 314 at 20–25.)

#### 1.  King

King argues his litigation positions were reasonable and legally permissible.  (Dkt. No. 320 at 5–11.)  King further argues the Court has already fashioned various remedies to sanction him and GPS for violation of the discovery rules and his dilatory conduct, and should not impose further, "duplicative" sanctions at this stage.  (*Id.* at 11–12.)

1

2. <u>Dovey</u>

2

Dovey argues he cannot be held liable for the litigation decisions of attorney King, which

3

were "uniquely in [King's] province" and cannot be imputed to King's client, GPS, much less to

4

Dovey, who was not King's client.  (Dkt. No. 316 at 3.)

5

3. <u>Analysis</u>

6

The Court has often warned King about GPS's litigation conduct, and has repeatedly

7

advised him about his obligations under Federal Rule of Civil Procedure 11 and 28 U.S.C.

8

§ 1927 to present meritorious arguments and avoid causing unnecessary delay.  (Dkt. Nos. 76 at

9

15; 88 at 9–10.)  Following the Court's denial of GPS's motion to file a fourth Amended Answer

10

and Counterclaims, the Court advised GPS that it would look unfavorably upon future motions to

11

amend from either party if they were "based upon facts or legal theories known to the parties

12

long before the motion was filed."  (Dkt. No. 88 at 9–10.)

13

The Court granted NPI's motion for sanctions and subsequent motion for attorney fees

14

after GPS failed to confer in good faith.  (Dkt. Nos. 189, 222.)  The Court denied GPS's motion

15

to disqualify NPI's counsel, finding "no basis" for the motion and questioning the need for the

16

motion.  (Dkt. No 189 at 10–14.)  The Court largely granted NPI's motion to strike entries from

17

the errata sheet from Gebow's deposition, finding the entries appeared to "significantly rewrite

18

Gebow's testimony, in many cases doing so in a manner favorable to [GPS]" with Gebow

19

(and/or Defendant) appearing to turn the deposition into a "take home examination" while

20

attempting to amend Gebow's testimony to better reflect GPS's litigation position.  (*Id.* at 16–

21

19.)

22

The Court later struck GPS's motions for summary judgment for failure to comply with

23

the local rules, and denied another motion from GPS to file an Amended Answer and

24

1    Counterclaims, finding GPS did not act diligently in seeking to amend its Answer and reminding

2    GPS of its admonition, nearly two years prior, that the Court would look unfavorably upon

3    future motions to amend if they were based upon facts or legal theories known to the parties long

4    before the motion was filed.  (Dkt. No. 248.)  The Court also found there was a colorable

5    argument that Defendant's delay in filing the motion to amend was due to bad faith.  (*Id.* at 6 n.

6    6.)

7        In granting NPI's motion to strike GPS's undisclosed theories, the Court, in precluding

8    GPS's evidence regarding antitrust damages, noted that it had "repeatedly cautioned Defendant

9    about its litigation tactics and has sanctioned [GPS] for failure to meet its discovery obligations."

10   (Dkt. 254 at 6.)  The Court found no sanction lesser than precluding the claim was appropriate

11   because it "would reward Defendant's dilatory tactics by further delaying resolution of this

12   case."  (*Id.* at 7.)  The Court also granted NPI's motion to strike GPS's undisclosed reasonable

13   royalty theories, declining to re-open discovery which would "further delay resolution of this

14   case and would reward [GPS's] dilatory tactics," and finding GPS's decision "to repeatedly

15   assert one position regarding the royalty, and then change that position in an expert's rebuttal

16   report without warning or explanation, appears to be consistent with [GPS's] prior tactics and

17   prejudices [NPI"s] ability to pursue its claims."  (*Id.* at 11.)  The Court also noted that GPS's

18   decision to disclose its new position on a claim term late in the discovery process "appear[ed]

19   consistent with [GPS's] dilatory tactics, create[d] needless uncertainty as to its legal theories, and

20   represents precisely the 'vexatious shuffling of positions' the Local Patent Rules are designed to

21   avoid."  (*Id.* at 17.)

22       Despite the dilatory tactics GPS employed during this litigation, the Court finds it

23   inappropriate to impose additional sanctions at this time.  As King points out, the Court has

24

1    already fashioned various remedies, including striking GPS's pleadings, precluding claims,

2    striking deposition errata and striking several of GPS's theories.  The Court also granted a

3    previous motion for sanctions and a related motion for attorney fees.  NPI argues these remedies

4    are insufficient to make NPI whole for the "legal bills that the litigation abuse occasioned."

5    (Dkt. No. 324 at 14 n. 9.), quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–

6    109 (2017.  However, the Court finds GPS's litigation misconduct, however questionable, does

7    not rise to the level of bad faith necessary to justify the imposition of additional sanctions under

8    either its inherent authority or pursuant to 28 U.S.C. § 1927.

9            **C.  Trial Preparation**

10           NPI argues Dovey and King deceitfully allowed NPI to spend six months preparing for

11   trial while planning to place GPS into bankruptcy, allowing NPI to invest hundreds of thousands

12   of dollars in trial preparation while permitting Dovey time to "dole[ ] out GPS's remaining

13   assets to himself, King, and other insiders."  (Dkt. No. 314 at 6, 24–27.)  NPI argues Dovey and

14   King executed their plan on the eve of trial, with the goal of thwarting NPI's ability to obtain a

15   judgment following the Court's favorable ruling on NPI's summary judgment motion.  (*Id.* at 6.)

16           1.  <u>King</u>

17           King argues he was not involved in, nor did he control, Dovey's decision to place GPS

18   into bankruptcy, and contends neither he nor Dovey had a duty to disclose Dovey's intention to

19   declare bankruptcy to NPI.  (Dkt. No. 320 at 12–13.)  King argues his duty was to advocate for

20   and defend GPS in the present case, not to assist Dovey with GPS's bankruptcy filing.  (*Id.* at

21   12.)

22

23

24

1

### 2. Dovey

Dovey argues he was not required to provide NPI with advance notice of his company's intention to file for bankruptcy. (Dkt. No. 316 at 1–3.) Dovey asserts he first consulted bankruptcy counsel on behalf of GPS in November 2024, after the Court's ruling on the parties' motions for summary judgment and soon after learning that any potential settlement could be beyond GPS's ability to pay. (Dkt. No. 317 at 1.) Dovey claims he did not make a decision at that time about filing for bankruptcy, and instead looked for ways to save his company. (*Id.*) Dovey claims his decisions to initiate state receivership proceedings and to file for bankruptcy were made only after NPI rejected a settlement offer, after which Dovey felt he had no other choice but to file for bankruptcy. (*Id.*)

### 3. Analysis

NPI argues Dovey and King knew by November 2024 that GPS would never proceed to trial. (Dkt. No. 324 at 13–14.) NPI asserts Dovey only argues he was not planning to proceed with bankruptcy "at that time" and cites statements from King which NPI claims are consistent with its theory that GPS never intended to go to trial. (Dkt. Nos. 321 at 15; 324 at 13–14.) As Dovey and King note, NPI cites no authority for the proposition that GPS was required to inform NPI that it was contemplating filing for bankruptcy, or of its plan to do so once the decision was made, even though GPS was clearly aware of the consequences of this decision. NPI presents no evidence to support its contention that Dovey deceived NPI to buy time so he could distribute GPS's remaining assets to himself and his associates. Accordingly, the Court finds insufficient evidence that Dovey and King's conduct between November 2024 and GPS's decision to file for bankruptcy in April 2025 rises to the level of bad faith.

1

**IV.    ORDER**

2

NPI's motion for sanctions against Dovey and King (Dkt. No. 314) is GRANTED with

3

respect to Dovey and King's presentation of an inequitable conduct counterclaim and DENIED

4

otherwise.  NPI shall present, within 21 days of this order, a motion for attorney fees detailing its

5

reasonable attorney fees, costs, and expenses incurred in defending against GPS's inequitable

6

conduct counterclaim.  NPI may also include in its motion expenses related to the motion for

7

sanctions and its fee petition.

8

Dated this 14th day of January, 2026.

9

10

David G. Estudillo
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24